**SLIP OP.  99 - 118**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| MANNESMANNROHREN-WERKE AG AND MANNESMANN PIPE & STEEL CORP., | : <br> : <br> : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| THE UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| GULF STATE TUBE DIVISION OF VISION METALS, | : <br> : |
| | : |
| Defendant-Intervenor. | : |
| | : |

**BEFORE: Wallach, Judge**
**Court No.: 98-04-00886**

**PUBLIC VERSION**

[Remanded in part]

Decided: October 29, 1999

Sutherland Asbill & Brennan LLP (Mark D. Herlach, Mary Patricia Michel and Christer L. Mossberg) for Plaintiffs.

David Ogden, Acting Assistant Attorney General; David M. Cohen, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch, (Velta A. Melnbrencis); Brian Peck, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Schagrin Associates (Roger B. Schagrin) for Defendant-Intervenor.

## OPINION

## I

## INTRODUCTION

At issue in this case are various determinations made by the U.S. Department of Commerce, International Trade Administration ("Commerce") in <u>Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe From Germany: Final Results of Antidumping Duty Administrative Review</u> ("<u>Final Results</u>"), 63 Fed. Reg. 13,217 (1998). Plaintiffs, Mannesmannrohren-Werke AG And Mannesmann Pipe & Steel Corp. ("Mannesmann"), through a motion for judgment on the agency record and an accompanying memorandum (collectively, "Mannesmann's Motion"), argue that Commerce erred (a) in its interpretation of 19 U.S.C. § 1677b(f)(2) and (3) (1994); (b) in its use of adverse facts available to value Mannesmann's purchases of steel billets from a related supplier; and (c) in its use of adverse facts available to value the customs duties Mannesmann paid on its U.S. sales.

For the reasons set forth below, the Court finds that while Commerce reasonably interpreted 19 U.S.C. § 1677b(f)(2) and (3) (1994), what Commerce has identified as substantial record evidence does not support its decisions to use adverse facts available. This determination is remanded to Commerce for further proceedings consistent with this opinion.

## II

## BACKGROUND

On March 18, 1998, Commerce issued its first administrative review of antidumping duties on certain small diameter seamless carbon and alloy steel pipes from Germany. This review covered one manufacturer/exporter of the subject merchandise, Mannesmannrohren-Werke AG and Mannesmann Pipe & Steel Corporation, for the period January 27, 1995, through

July 31, 1996.  Final Results, 63 Fed. Reg. at 13,217.  Two aspects of this review are relevant for present purposes.


## Commerce's Affiliated Party Input Adjustment:


As in any antidumping investigation, in this instance Commerce was required to compare the U.S. prices of the subject merchandise to the prices ("normal value") for the same or similar merchandise in the home market.  See 19 U.S.C. § 1677a (1994) ("Export price and constructed export price") and 19 U.S.C. § 1677b (1994) ("Normal value").  In the course of calculating the normal value of the subject merchandise in this case, Gulf State Tube Division of Vision Metals, a domestic interested party and Defendant-Intervenor in the current action, alleged that Mannesmann was selling the foreign like product in its home market (Germany) at prices below Mannesmann's cost of production.  Pursuant to 19 U.S.C. § 1677b(b) (1994), such below cost sales, if shown to exist, may be disregarded by Commerce in its calculation of normal value.  On January 31, 1997, Commerce determined that this allegation of below-cost sales was adequately supported, initiated a sales-below-cost investigation, and requested that Mannesmann respond to Section D of Commerce's Antidumping Duty Questionnaire, covering "Cost of Production and Constructed Value."  See Letter from Linda Ludwig to Mark Herlach of 01/31/97, Appendix of Record Documents Accompanying The Memorandum In Support Of The Motion Of Plaintiffs [Mannesmann] For Judgment On The Agency Record "Mannesmann Appendix"), App. 3.  Mannesmann does not contest initiation of the below-cost sales investigation.


Although the Section D Questionnaire requested substantial information concerning Mannesmann's cost-of-production, the question here most pertinent was Question II.A.6.b.  In relevant part, Question II.A.6. provided as follows:

> 6.      List the major inputs received from affiliated parties and used to produce the merchandise under review during the cost calculation period. . . .  For each major input identified, provide the following information:

a.      the total volume and value of the input purchased from all sources by your company during the cost calculation period, and the total volume and value purchased from each affiliated party during the same period;

b.      the per-unit transfer price charged for the input by the affiliated party (if the affiliated party sells the identical input to other, unaffiliated purchasers, provide documentation showing the price paid for the input by the unaffiliated purchaser; if your company purchases the identical input from unaffiliated suppliers, provide documentation showing the unaffiliated party's sales price for the input); and

c.      if you are responding to this section of the questionnaire in connection with an investigation of sales below cost, provide the per-unit cost of production incurred by the affiliated party in producing the major input.

In addition, specify the basis used by your company to value each major input for purposes of computing the submitted COP and CV amounts (e.g. transfer price, cost of production).

Defendant's Memorandum In Opposition To Plaintiffs' Motion For Judgment On The Agency Record ("Defendant's Response"), Public Ex. 1, at 91-92.

Mannesmann responded to subpart (a) of the question by stating, inter alia, that it had not "sourced billets used in producing subject merchandise from unrelated parties."  Response Of [Mannesmann] To Section D Of The Antidumping Questionnaire, Mannesmann Appendix, App. 4, at 8.  This answer was not fully responsive, since the question asked for information on input purchases related to the "merchandise under review" and not "subject merchandise."  As defined in a footnote to Section A of Commerce's Antidumping Questionnaire, "products under review" and "merchandise under investigation" referred generally to "all products within the scope of the order that your company sold during the period of review in any market," while "subject merchandise" referred only to "products sold to the United States."  See Commerce's Antidumping Questionnaire, Defendant's Response, Public Ex. 1, at 15 n.6.

In response to subpart (b) of Question II.A.6., Mannesmann provided a substantial amount of information concerning its relationship with Huttenwerke Krupp Mannesmann GmbH ("HKM"), an affiliated party from whom it purchases the vast majority of the steel it uses to produce seamless and welded tubes. See Response Of [Mannesmann] To Section D Of The Antidumping Questionnaire, Mannesmann Appendix, App. 4, at 9-13. Mannesmann's response, however, did not provide any information in regard to the last part of subpart (b), which requested that "if your company purchases the identical input from unaffiliated suppliers, provide documentation showing the unaffiliated party's sales price for the input." Commerce's Antidumping Questionnaire, Defendant's Response, Public Ex. 1, at 91.

Finally, responding to subpart (c) of Question 6, Mannesmann stated that it utilized transfer price from its affiliated supplier, HKM, to value steel billets, and that "this transfer price exceeded HKM's cost of production." Response Of [Mannesmann] To Section D Of The Antidumping Questionnaire, Mannesmann Appendix, App. 4, at 14. As discussed below, this statement was of considerable importance, since Commerce found that reliance on transfer price from an affiliated party makes 19 U.S.C. §1677b(f)(2) (1994) applicable to its analysis and findings.

Subsequently, Commerce provided Mannesmann with a supplemental questionnaire ("Supplemental Section D Questionnaire"), which asked Mannesmann two further questions that are relevant here. First, Question 11 of the Supplemental Section D Questionnaire asked Mannesmann:

> As requested in the original Section D questionnaire, please provide a complete, translated listing of *all inputs* used to produce the merchandise under review. For each input received from an affiliated party, provide the name of the affiliated party and state the nature of the affiliation. Also, report the total volume and value of the purchases and the percentage of the COM of the subject merchandise represented by the value of the purchases.

Response Of [Mannesmann] To Supplemental Section D Of The Antidumping Questionnaire, Mannesmann Appendix, App. 5, at 7 (emphasis in original).  Answering this question, Mannesmann provided the short response that "[s]teel billets are the only input from affiliated suppliers for the subject merchandise.  All of the steel billets purchased for producing the subject merchandise were produced at HKM."  Id.  Once again, this response was limited to "subject merchandise," although the question asked for information on the broader category of "merchandise under review."

Second, Question 12 of the Supplemental Section D Questionnaire asked that Mannesmann:

> Use the following headings to provide a chart which reports purchases of billets from *unrelated* suppliers, regardless of whether or not they are used in subject merchandise.  (Unrelated supplier, month during [the period of review], billet grade, volume purchased, value of purchases. [sic]

Id. (emphasis in original).  Mannesmann responded to this question by providing an exhibit that listed billet purchases from unrelated suppliers.  See id. at 8; Chart Regarding Purchases of Billets, id. at Ex. D-4.  This exhibit, however, did not respond to Commerce's request for billet grade information.

Seeking yet further information, Commerce thereafter requested that Mannesmann answer a third questionnaire (Commerce's "Second Supplemental Section D Questionnaire").  Question 4 of that questionnaire stated as follows:

> In Exhibit D-4 of the Supplemental D questionnaire response, you provided a breakdown of billet purchases from unaffiliated parties.  When compared to the billet prices provided in Exhibit E of the Section D response, it appears that the average POR cost of billets purchased from unaffiliated parties significantly exceeds the cost of billets purchased from HKM.  Explain the reason for such difference.

Mannesmann Second Supplemental Section D Response, Mannesmann Appendix, App. 6, at 2. Explaining this cost differential between billets from affiliated and unaffiliated suppliers, Mannesmann responded, inter alia, that:

> MWR and MWS only purchase from other suppliers billets that HKM does not produce, such as billets comprised of special alloy grades or purities. The price of these specialized billets with higher alloy content or higher purity is quite naturally greater than the price for the standard grade billets manufactured by HKM.

Id. at 3.

On September 9, 1997, Commerce published the preliminary results of its administrative review in the Federal Register. See Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe From Germany: Preliminary Results of Antidumping Duty Administrative Review ("Preliminary Results"), 62 Fed. Reg. 47,446 (1997). In the Preliminary Results, Commerce calculated Mannesmann's cost of production by disregarding those billet sales between Mannesmann and HKM that did not reflect market value for these inputs. See id. at 47,451. In those instances where Commerce found that the billet sales between Mannesmann and HKM did not reflect market value, Commerce, pursuant to § 773(f)(2) and (3) of the Tariff Act of 1930 [19 U.S.C. § 1677b(f)(2) and (3) (1994)], used market prices to value the inputs purchased from HKM and, in turn, calculate Mannesmann's cost of production. See id.; see also Department of Commerce Preliminary Results Analysis Memorandum of 09/02/97, Mannesmann Appendix, App. 11 ("Preliminary Results Memo."), at 16.

To determine market value, Commerce compared the relative prices of one grade of billets which Mannesmann had purchased from both affiliated and non-affiliated parties during the period of review. See Preliminary Results, 62 Fed. Reg. at 47,451. Finding the price paid to the non-affiliated party to be 30.9 % higher than the price paid to HKM, Commerce increased the transfer prices reported for all HKM billet sales to Mannesmann by 30.9% to approximate

 market value.  See id.; Preliminary Results Memo. at 16.  As 94.21% of Mannesmann's billet purchases was from HKM, this resulted in an aggregate cost of steel billets 29.11 % higher than originally reported by Mannesmann.  See Preliminary Results Memo. at 16.[1]

In response to this aspect of the Preliminary Results, Mannesmann argued, inter alia, that Commerce "improperly invoked the special rule for major inputs in section 773(f)(3) of the Act when it ignored Mannesmann's verified billet costs in calculating the company's cost of production."  Final Results, 63 Fed. Reg. at 13,218.  Mannesmann also argued that Commerce "had no reasonable basis for applying an across-the-board percentage price increase on all billets based on one exceptional purchase of a steel grade that was not sold in the United States."  Id. at 13,219.

In the Final Results, Commerce dismissed both these criticisms.  After first reaffirming its position in the Preliminary Results, Commerce stated that "[w]e disagree with Mannesmann's assertion that the Department improperly invoked the special rule for major inputs."  Id. According to Commerce, § 773(f)(2) and (3) of the Tariff Act of 1930 gave it the legal authority to use the highest of transfer price, cost of production, or market value to value the billets purchased from HKM.  Id. at 13,219-20.

Addressing Mannesmann's second complaint (that Commerce had no reasonable basis for applying the market value adjustment to all purchases from affiliated suppliers), Commerce stated that, because Mannesmann had not acted to the best of its ability to comply with its information requests, it was applying this market value adjustment in the Final Results as adverse

---

[1]  By increasing the price of a party's inputs, Commerce increases the party's cost of production for purposes of excluding below-cost sales.  This, in term, leads the "normal value" of a party's home market sales to be higher, since a larger percentage of a party's home market sales will be excluded as having been made "below cost."  See Raj Bhala, International Trade Law:  Cases and Materials 654 (1996) ("It is an arithmetic fact that the exclusion raises the average and, therefore, increases the likelihood of finding, and size of, a dumping margin.")

facts available.  Id.  This decision to apply adverse facts available appears to have been based on two events.  First, Commerce observed that although it requested information on any purchases of the identical input from unaffiliated suppliers in Question II.A.6.b of the Section D Questionnaire, "Mannesmann did not respond to this portion of the questionnaire."  Id.; see also Department of Commerce Final Results Analysis Memorandum of 03/09/98, Mannesmann Appendix, App. 8 ("Final Results Memo."), at 14.  Second, and in regard to Question 4 of the Second Supplemental Section D Questionnaire, Commerce pointed out that although Mannesmann stated that it "only purchase[d] from other suppliers billets that HKM does not produce, such as billets comprised of special alloy grades or purities," this assertion did not hold true at verification.  See Final Results, 63 Fed. Reg. at 13,220; Final Results Memo. at 14.  Sampling Mannesmann's purchases for one month, Commerce discovered purchases by Mannesmann of the same grade of billets from both HKM and an unaffiliated party.  Final Results Memo. at 14.  Commerce viewed this as "an unexpected discovery, as Mannesmann had specifically denied that they purchase the same grade of billets from HKM and unaffiliated parties."  Id.

**Mannesmann's Reported U.S. Duties:**

The second part of the Final Results at issue involves the customs duties that Mannesmann, in answering Section C of the Commerce's Antidumping Questionnaire, reported that it had paid on its U.S. sales.

During verification, Commerce examined over half of Mannesmann's total U.S. sales in its review of U.S. duty paid.  See Mannesmann's Motion at 28 (noting that Commerce's observations covered 52% of the subject merchandise (in terms of tonnage) sold in the United States).  In determining whether U.S. duty was properly reported, Commerce "summed total U.S. duty paid on the entry [Commerce was] examining and compared it to total U.S. duty reported in the applicable observations."  Final Results, 63 Fed. Reg. at 13,222.  For several entries,

Commerce found that Mannesmann had underreported the total U.S. duty paid -- a fact which it found "indicates that errors exist which are more pervasive than can be explained by rounding or allocation methodologies." Id. Further, at verification Mannesmann was unable to recreate or explain the allocation methodologies it used in its submission to Commerce. Id.

In light of these findings, Commerce again determined that the use of adverse facts available was appropriate, since "[b]y not providing verifiable information for U.S. duties when such information was available to Mannesmann . . . Mannesmann failed to cooperate by not acting to the best of its ability to comply with a request for information." Id. at 13,222-23. Accordingly, for the Final Results, Commerce used the duty rates reported by Mannesmann in the three instances where it was able to confirm Mannesmann's figures. Id. at 13,222; Final Results Memo. at 12. For all other sales, however, including those where Commerce otherwise calculated the correct amount of duty paid, Commerce used the highest U.S. duty amounts reported by Mannesmann. Final Results, 63 Fed. Reg. at 13,222.[2] Generally, this resulted in duties significantly higher than either those reported by Mannesmann or, where applicable, those calculated by Commerce. See, e.g., Analysis of U.S. Duty Adjustment, Mannesmann's Motion, Ex. A.

---

[2] Specifically, Commerce applied the highest reported duty amount for carbon products ($86.35/ton) to all sales of carbon products, and it applied the highest reported duty amount for alloy products ($119.07/ton) to all sales of alloy products. See Final Results, 63 Fed. Reg. at 13,222; Final Results Memo. at 12.

**III**

**DISCUSSION**

**A**

**Standard Of Review**

The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).  Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion.  Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."  Ceramica Regiomontana, S.A., 10 CIT at 404-5, 636 F. Supp. at 966.

In reviewing an agency's construction of a statute that it administers, the Court's initial inquiry is to determine "whether Congress has directly spoken to the precise question at issue."  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984).  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  Id. at 843-44.  Consequently, "[t]he court will defer to the agency's construction of the statute as a permissible construction if it 'reflects a plausible construction of the plain language of the statute[s] and does not otherwise conflict with Congress' express intent.'"  Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996) (quoting Rust v. Sullivan, 500 U.S. 173, 184 (1991)).

**B**

**Commerce Correctly Interpreted The Statutory Framework For
Valuing Mannesmann's Billet Costs.**

As noted above, in the Final Results Commerce interpreted 19 U.S.C. § 1677b(f)(2) and

(3) (1994) as giving it the legal authority to use the highest of transfer price, cost of production,

or market value to value the billets Mannesmann purchased from HKM.  Pursuant to this

interpretation, Commerce used constructed market values in valuing these billets, per §

1677b(f)(2), since it found that this value exceeded both the transfer price reported by

Mannesmann and HKM's cost of production.  See Preliminary Results Memo. at 16.

Mannesmann challenges this result as an improper application of the "major input rule," 19

U.S.C. § 1677b(f)(3).  Mannesmann argues that Commerce "should never have applied an

alternative valuation under § 1677b(f)(2) as a substitute for actual billet transfer prices because

the condition precedent contained in § 1677b(f)(3) (the use of a below cost input), which triggers

the ability of the agency to resort to § 1677b(f)(2), was not met."  Plaintiffs' Reply To Defendant's

Memoranda In Opposition To Plaintiffs' Motion For Judgment On The Agency Record

("Mannesmann's Reply") at 2.  According to Mannesmann, § 1677b(f)(3) would permit

Commerce to disregard the transfer prices for billets supplied by HKM, and use § 1677b(f)(2) to

value major inputs, only if the transfer prices were found to be below HKM's cost of production.

See id. at 3 ("[W]hen major inputs are involved, resort to § 1677b(f)(2) is only permitted if the

transfer price of the major input is below cost.").  This condition precedent, Mannesmann asserts,

was not met in this case, since Commerce fully examined HKM's cost data and verified that HKM

sold billets to Mannesmann at prices above its cost of production.  See Mannesmann's Motion at

9-10.

In relevant part, 19 U.S.C. § 1677b(f)(2) and (3) (1994) provide as follows:

**(2) Transactions disregarded**

A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

**(3) Major input rule**

If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

On its face, nothing in the language of these provisions supports Mannesmann's position that the "major input rule" serves as any sort of condition precedent to § 1677b(f)(2). First, nothing in § 1677b(f)(2) either makes reference to § 1677b(f)(3) or otherwise indicates that, before relying on market values in the case of a "major input," Commerce must show that the transfer prices at issue are below the affiliated party's cost of production. Rather, by its plain language, § 1677b(f)(2) simply sets forth a general rule for affiliated party transactions which provides that, for purposes of calculating cost of production and constructed value, Commerce may disregard such transactions when "the amount representing [the transfer price] does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration" (i.e., market price). In such circumstances, this provision allows Commerce, in the absence of other transactions between non-affiliated parties, to use information available concerning market prices to value the "cost" of an affiliated-party input.

Similarly, no language in the "major input rule" indicates that it is to serve as a condition precedent to § 1677b(f)(2). Section 1677b(f)(3) provides, inter alia, that where a major input is

involved, and where Commerce "has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input," Commerce may value the input involved using information available about its cost of production. By its plain language, the requirement that Commerce have "reasonable grounds to believe or suspect" a below-cost sale serves as a condition precedent to Commerce's use of an affiliated party's cost-of-production. Nothing in the language of § 1677b(f)(3) indicates that it is also to be a condition precedent to Commerce's use of market values under § 1677b(f)(2), as Mannesmann asserts. Had Congress intended such a result, it could have made this condition clear in the language of the statute.

In contrast to Mannesmann's argument, however, the Government's position appears to be a reasonable interpretation of this statutory scheme. The plain language of § 1677b(f)(3) makes clear that although Commerce may use an affiliated party's cost-of-production to value a major input, it may only do so when (1) Commerce has "reasonable grounds to believe or suspect" that the cost-of-production exceeds the transaction value reported; and (2) the cost-of-production exceeds the market value of the input, as determined under § 1677b(f)(2). Similarly, the plain language of § 1677b(f)(2) makes clear that Congress may substitute an arms-length, or market, value ("what the amount would have been if the transaction had occurred between persons who are not affiliated") for a reported transfer price when the transfer price "does not fairly reflect" market value. Read together, these provisions appear to create a statutory scheme in which Commerce is to use the highest of market price, actual transfer price, or cost-of-production in valuing a major input supplied by an affiliated party. This, of course, is exactly how Commerce interpreted these provisions and applied them to the case at bar.

In addition to the statutory language, the legislative history of the major input rule further supports Commerce's interpretation. In support of its position, Mannesmann cites a House conference report for the proposition that "[c]learly, the conferees contemplated that the Department would use 'best information' only if the related seller 'does not provide reliable data

on its cost [sic] of production.'"  Mannesmann's Motion at 12 (quoting H.R. Conf. Rep. No. 100-576, at 595 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1628).  Since Mannesmann supplied, and Commerce verified, HKM's cost-of-production data, Mannesmann repeats its argument that "[t]here was no basis to reject the actual cost data in favor of a manifestly less accurate figure [arms-length values]."  Id.

Mannesmann errs in trying to pick a selected aspect of the major input rule, § 1677b(f)(3), and apply it to § 1677b(f)(2).  In relevant part, Mannesmann cites to the following section of House Conference Report No. 100-576:

> The conferees expect that, if petitioner makes a bona fide allegation that the transfer price for the major input or the arms-length price is less than the related party's cost of production, then Commerce will investigate such claims and may request cost-of-production information from the related party seller of the input.  If the related party seller does not provide reliable data on its costs of production, and Commerce has reasonable grounds to believe or suspect that the transfer price and also the arms-length price would be less than the cost of production, then Commerce should use best information to establish a reasonable estimate of the related party's costs of production for such input.

H.R. Conf. Rep. No. 100-576, at 595 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1628 (emphasis added).  Contrary to what Mannesmann alleges, the "best information" referred to in this language does not refer to arms-length prices used in accordance with § 1677b(f)(2), but refers only to estimates of a related party's cost-of-production for purposes of § 1677b(f)(3).  Commerce, however, did not rely on the major input rule as a basis for disregarding the transfer prices reported by Mannesmann.  Rather, after verifying that HKM's billets costs did not exceed the transfer prices reported by Mannesmann, Commerce relied on § 1677b(f)(2) in using market values to value the billet inputs.  Accordingly, the legislative history concerning "best information" for purposes of the major input rule simply had no relevance to Commerce's analysis.

Beyond simply not supporting Mannesmann's argument concerning "best information," however, the legislative history of the major import rule actually supports Commerce's interpretation of § 1677b(f)(2) and (3). As stated in the quotation above, the conferees made clear in H.R. Conf. Rep. No. 100-576 that Commerce should use best information to estimate a related party's cost of production <u>only</u> when it has "reasonable grounds to believe or suspect that the transfer price <u>and also the arms length price</u> would be less than the cost of production." <u>Id.</u> (emphasis added). Similarly, in making reference to the relationship of the "new" major input rule to §773 of the Trade Act, the conference report explicitly says that valuation under this rule would only take place "when such costs are greater than the price that would be used as a result of the application of paragraph (2) ('arms-length price')." <u>Id.</u> Finally, a summary for the major input rule provided in the conference report states:

> The Senate recedes with a substitute amendment which provides . . . (2) authority for the Commerce Department, when foreign market value is based on constructed value, to base the value of a major input which has been provided by a related party on its costs of production, <u>rather than the price authorized under section 773(e)(2),</u> <u>when certain conditions exist.</u>

<u>Id.</u> at 594, <u>reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1627 (emphasis added).

All three of these quotations demonstrate that, far from creating an independent rule to govern affiliated party transactions involving "major inputs," Congress actually intended the major input rule to be an exception to the general rule set out in § 773(e)(2) of the Trade Act [19 U.S.C. § 1677b(f)(2) (1994)]. Like the language of the major input rule itself, the conference report makes clear that this exception only has relevance when Commerce has "reasonable grounds to believe or suspect" that both the transfer price and the arms-length price would be less than the affiliated party's cost of production. Consistent with this explanation, in this case Commerce did not rely on the major input rule, since it found that HKM's cost-of-production did not exceed either of these two prices. Accordingly, given the facts at hand, the legislative history cited above indicates that Commerce acted reasonably in interpreting the provisions of §

1677b(f)(2), and not those of the major input rule, as applying to the valuation of Mannesmann's billet purchases.[3]

In short, both the plain language of § 1677b(f)(2) and (3), as well as the legislative history of the major input rule, support Commerce's decision to use the highest of transfer price, cost of production, or market value to value the billets Mannesmann purchased from HKM. Contrary to Mannesmann's claims, Commerce reasonably interpreted § 1677b(f)(2) and (3) in finding that § 1677b(f)(3) did not limit its ability to use market value information, notwithstanding the fact that HKM's billet costs of production were verified as being below the transfer prices reported by Mannesmann. Accordingly, the Court rejects Mannesmann's claims on this point.

## C

## Commerce's Use Of Adverse Facts Otherwise Available To Value Mannesmann's Billet Purchases Was Neither In Accordance With Law Nor Supported By Substantial Record Evidence.

Pursuant to 19 U.S.C. § 1677e(a) (1994), Commerce is required to use facts otherwise available[4] if necessary information is not available on the record, or:

(2) an interested party or any other person -
    (A) withholds information that has been requested by [Commerce]
    . . . under this subtitle,

---

[3] Mannesmann also cites SKF USA Inc. and SKF GmbH v. United States, 19 CIT 625, 888 F. Supp. 152 (1995), as supporting its position that the major input rule cannot be applied to the case at bar. See Mannesmann's Motion at 10; Mannesmann's Reply at 4-5. While SKF is distinguishable from this case in many ways, it is sufficient to say that nothing in SKF undermines the reasonableness of Commerce's interpretation of § 1677b(f)(2) and (3). In fact, because of the factual difference between the two cases, the Court's analysis in SKF is irrelevant to the question at hand.

[4] Formerly referred to as "best information available" or "BIA" under 19 U.S.C. § 1677e(c) (1988).

(B) fails to provide such information by the deadlines for
submission of the information or in the form and manner
requested, subject to subsections (c)(1) and (e) of section 1677m of
this title,
(C) significantly impedes a proceeding under this subtitle, or
(D) provides such information but the information cannot be
verified as provided in section 1677m(i) of this title.

Section 1677e(a) provides, however, that the use of facts available shall be subject to the

limitations set forth in 19 U.S.C. § 1677m(d) (1994). Section 1677m, which were enacted as

part of the Uruguay Round Agreements Act ("URAA"), Pub. L. 103-465 § 231, is "designed to

prevent the unrestrained use of facts available as to a firm which makes its best effort to

cooperate with [Commerce]." Borden, Inc. v. United States, 4 F. Supp.2d 1221, 1245 (CIT

1998). Section 1677m(d), entitled "[de]ficient submissions," provides that:

If [Commerce] . . . determines that a response to a request for information under
this subtitle does not comply with the request, [Commerce] . . . shall promptly
inform the person submitting the response of the nature of the deficiency and
shall, to the extent practicable, provide that person with an opportunity to remedy
or explain the deficiency in light of the time limits established for the completion
of investigations or reviews under this subtitle. If that person submits further
information in response to such deficiency and either -
    (1) [Commerce] finds that such response is not satisfactory, or
    (2) such response is not submitted within the applicable time
    limits,
then [Commerce] . . . may, subject to subsection (e) of this section, disregard all
or part of the original and subsequent responses.

Subsection (e), in turn, provides that:

In reaching a determination . . . [Commerce] . . . shall not decline to consider
information that is submitted by an interested party and is necessary to the
determination but does not meet all the applicable requirements established by
[Commerce] . . . if -
    (1) the information is submitted by the deadline established for its
    submission,
    (2) the information can be verified,
    (3) the information is not so incomplete that it cannot serve as a reliable

basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its
ability in providing the information and meeting the requirements
established by [Commerce] . . . with respect to the information, and
(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e) (1994).

In short, before Commerce may use facts available, 19 U.S.C. § 1677m(d) (1994) requires that Commerce give a party an opportunity to remedy or explain deficiencies in its submission. If the remedy or explanation provided by the party is found to be "not satisfactory" or untimely, the information may be disregarded in favor of facts available, subject to the five part test in Subsection (e). See Borden, 4 F. Supp.2d at 1245 ("Subsection (e) may require use of the respondent's information notwithstanding that a remedy or explanation is unsatisfactory.").

Once Commerce determines that use of facts available is warranted, 19 U.S.C. § 1677e(b) (1994) further permits Commerce to apply an adverse inference if it makes the additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." As this Court has recently made clear, in order to find that a party "has failed to cooperate by not acting to the best of its ability," it is not sufficient for Commerce to simply assert this legal standard as its conclusion or repeat its finding concerning the need for facts available. See Borden, 4 F. Supp.2d at 1246 ("Here, the Department did not make the required additional finding that De Cecco had failed to act to the best of its ability. In essence, it simply repeated its 19 U.S.C. § 1677e(a)(2)(B) finding, using slightly different words . . . .") (citation omitted); Ferro Union, Inc. v. United States, 44 F. Supp.2d 1310, 1329 (CIT 1999) ("Once Commerce has determined under 19 U.S.C. § 1677e(a) that it may resort to facts available, it must make additional findings prior to applying 19 U.S.C. § 1677e(b) and drawing an adverse inference.").

Rather, to be supported by substantial evidence, Commerce needs to articulate why it

concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation. See Ferro Union, 44 F. Supp.2d at 1332 ("If overall the failure to identify these companies was of no significance to the progress of the investigation, then Commerce cannot apply total adverse facts on the basis of the non-identification of these companies."). As recently noted, "[u]nder the URAA, Commerce is now required to make more subtle judgments than under the previous best information available ('BIA') standard." Id. at 1329.

Applying these standards to the facts at hand, the Court finds that Commerce's decision to use adverse facts available in this instance is neither in accordance with law nor supported by substantial record evidence.

**1**

**Commerce Has Not Adequately Identified How Mannesmann
"Failed to Cooperate by Not Acting to the Best of its Ability."**

In support of its Motion For Judgment On The Agency Record, Mannesmann essentially argues that Commerce's use of adverse facts available to value its billet purchases from HKM was inappropriate, since Mannesmann fully and timely complied with Commerce's requests for information. See Mannesmann's Motion at 22-27; Mannesmann's Reply at 6-12. According to Mannesmann, this Court's case law makes clear that Commerce's use of adverse information is limited to circumstances where a party has ignored Commerce's requests, "failed to provide information key to a substantive determination, or otherwise behaved in ways that render the Department's regulatory duties impossible to perform." Mannesmann's Motion at 24. At most, Mannesmann argues, it reported information "with arguably minor errors," and that this "is not the same as deliberately withholding information or deliberately misleading ITA with respect to key information." Mannesmann's Reply at 8. In support of these points, Mannesmann also alleges that Commerce misrepresents as inadequate, inconsistent and misleading its responses to

Commerce's questions concerning input purchases from unaffiliated suppliers. See Mannesmann's Motion at 14-21.

In response, Defendant argues that the fact that Mannesmann may have responded fully to requests for other information is irrelevant to the issue of whether it was justified in using adverse facts available. See Defendant's Response at 23. According to Defendant, Commerce clearly did not fully reply to Question II.A.6.b of the first Section D Questionnaire, since Mannesmann, in limiting its response to "subject merchandise," did not provide the market price information requested concerning any purchases of the identical input from unaffiliated suppliers. See id. at 21-22. As Defendant notes, "question 6.b did not refer to 'subject merchandise' and the introductory paragraph of question 6 clearly referred to major inputs used to produce [the broader category] 'the merchandise under review.'" Id. at 22. In addition, Defendant also reiterates Commerce's finding from the Final Results that Mannesmann's response to Question 4 of the Second Supplemental Section D Questionnaire was "misleading information because, as Commerce discovered at verification, Mannesmann had purchased during one sampled month the same grade of steel billets from the affiliated as well as the unaffiliated supplier." Id. at 22-23. Adding these two instances together, Defendant argues, "Commerce properly found that Mannesmann had failed to cooperate by not acting to the best of its ability . . . and drew an inference adverse to Mannesmann." Id. at 23.

For its part, Defendant-Intervenor adds that, in addition to the failings identified by Commerce, Mannesmann inappropriately limited its responses to Question 11 of the Supplemental Section D Questionnaire and Question 4 of Second Supplemental Questionnaire to "subject merchandise," and omitted important grade information requested by Commerce in the Supplemental Section D Questionnaire. Memorandum of Gulf States Tube Division Of Vision Metals In Opposition To Plaintiff's Motion For Judgment On The Agency Record ("Defendant-Intervenor's Response") at 20-22.

As discussed previously, in the Final Results and the Final Results Memorandum
Commerce identified two errors in support of its conclusion that Mannesmann failed to cooperate
by not acting to the best of its ability to comply with Commerce's information requests:  (1)
Mannesmann's failure to fully respond to Question II.A.6.b of the first Section D Questionnaire;
and (2) Mannesmann's inaccurate response to Question 4 of the Second Supplemental Section D
Questionnaire.  See Final Results, 63 Fed. Reg. at 13,220; Final Results Memo. at 14-15.  In
discussing the first of these errors in the Final Results, Commerce stated simply that "[m]arket
price information was requested in the Section D questionnaire for any purchases of the identical
input from unaffiliated suppliers, but Mannesmann did not respond to this portion of the
questionnaire." Final Results, 63 Fed. Reg. at 13,220.  In its Final Results Memorandum,
Commerce remarked on the significance of this omission, stating that Mannesmann "failed to
respond to the Department's request to an issue that has great importance and relevance to the
verification."  Final Results Memo. at 14.

In regard to the second alleged error, Mannesmann's statement that "MWR and MWS
only purchase from other suppliers billets that HKM does not produce," Commerce noted that:

> At verification the Department attempted to verify this claim by examining
> Mannesmann's purchases of billets in one sample month.  We discovered one such
> purchase in this month, and utilized this purchase price as market value.

Final Results, 63 Fed. Reg. at 13,220.  According to Commerce, "[i]t was reasonable to assume
that because Mannesmann's assertion was found to be untrue in one sample month, that there may
have been other instances in which Mannesmann's claim proved untrue and the same grade of
billets was purchased from both HKM and un unaffiliated party."  Final Results Memo. at 14-15.

Through these statements and its decision to use adverse facts available, Commerce
appears to suggest that Mannesmann had evidence concerning its purchases of billets from

unaffiliated suppliers that were of the same grade as those purchased from HKM, but willfully tried to keep such information from Commerce. Commerce, however, does not explicitly state such a conclusion, nor does it identify why these two errors were anything more than inadvertent omissions. For instance, while Commerce observes that Mannesmann "failed to respond" to Commerce's information request in Question II.A.6.b of the first Section D Questionnaire, Final Results Memo. at 14, failure to respond is only a basis for using "facts available." See 19 U.S.C. § 1677e(a)(2)(A) (1994) (withholding requested information) and 19 U.S.C. § 1677e(a)(2)(B) (1994) (failure to provide requested information by the appropriate deadlines or in the form and manner requested). Without an additional finding that this failure to respond was because Mannesmann "failed to cooperate by not acting to the best of its ability," however, 19 U.S.C. § 1677e(b) (1994) prohibits Commerce from applying an adverse inference.

In this regard, the facts of this case are similar to those addressed in Ferro Union v. United States, 44 F. Supp.2d 1310 (CIT 1999). In that case, although Commerce stated that the respondent had "significantly impeded the review," the Court found that significantly impeding a review, without more, is not a basis for drawing an adverse inference. As the Court noted:

> "Significantly impeding the review" is only sufficient grounds to warrant an application of facts available pursuant to 19 U.S.C. § 1677e(a)(2)(C). The additional finding that a party failed to comply "to the best of its ability" must be made to warrant an application of adverse facts available under 19 U.S.C. § 1677e(b).

Ferro Union, 44 F. Supp.2d at 1329. (footnote omitted). In a footnote, the Court further explained:

> Although these two standards, "significantly impeding" and "failing to cooperate to the best of its ability", appear quite similar, there is a statutory distinction, and only the latter leads to the application of adverse facts. Impeding the review does not have to be read negatively. A respondent could impede a review without intending to do so, for example, because it did not understand the questions asked. The statute requires an additional finding under Section 1677e(b) that a respondent could have complied, and failed to do so.

Id. at 1330 n.44.

This explanation is equally applicable to Mannesmann's failure to fully respond to Question II.A.6.b. Although failing to respond to an information request is a basis for using "facts available," once the requirements of 19 U.S.C. § 1677m(d) and (e) (1994) have been met, failing to respond does not have to be read negatively. A respondent can fail to respond because it was not able to obtain the requested information, did not properly understand the question asked, or simply overlooked a particular request. Thus, without further explanation by Commerce, the Court will not infer that a respondent's failure to respond constitutes substantial evidence that it failed to cooperate to the best of its ability. This is especially true where, as here, a respondent sought to correct its deficiencies in responding to a supplemental questionnaire.

Concerning the second basis asserted by Commerce for using adverse facts available, Mannesmann's alleged misrepresentation in response to Question 4 of the Second Supplemental Section D Questionnaire, Commerce similarly fails to explain why it believes this misrepresentation constitutes anything more than an inadvertent error. As noted above, in its Final Results Memorandum, Commerce explains that Mannesmann's answer "was found to be untrue during the course of sampling at verification," Final Results Memo. at 14, and that "[i]t was reasonable to assume that because Mannesmann's assertion was found to be untrue in one sample month, that there may have been other instances in which Mannesmann's claim proved untrue and the same grade of billets was purchased from both HKM and an unaffiliated party," id. at 14-15.

Even taking Commerce's assumption concerning "other instances" to be true, nothing in this conclusion addresses the issue of whether Mannesmann cooperated to the best of its ability. As Mannesmann points out in its Reply, the 80-ton billet purchase that Commerce discovered at verification constituted only ".08 percent of Mannesmann's monthly purchase of tube rounds

from its affiliated supplier." Mannesmann's Reply at 8 n.4. Omission of one or more purchases of such a relatively small quantity could just as easily have been an oversight by Mannesmann as a deliberate evasion. As such, the Court will not uphold, without a more substantial showing, Commerce's conclusion that Mannesmann's failure to mention this purchase was willful -- especially in the face of Mannesmann's firm assertion to the contrary. See id. at 8 ("At the time it responded to ITA's questionnaire, the responsible company officials were not aware of any purchases of the same grade of input billets that were purchased from both affiliated and unaffiliated suppliers."); cf. Helmerich & Payne, Inc. v. United States, 24 F. Supp.2d 304, 309 n.16 (CIT 1998) ("Plaintiff here does not claim that it was providing information to the best of its ability and that therefore Commerce erred in adopting adverse inferences. . . . Here, neither Plaintiff nor NKK claimed that they could not submit the information. NKK simply did not complete the questionnaire.").

In short, Commerce failed to identify any basis for its determination that Mannesmann purposely failed to cooperate in this aspect of its investigation, as 19 U.S.C. § 1677e(b) (1994) now requires. See Borden, 4 F. Supp.2d at 1247 ("Commerce has articulated no reason for finding De Cecco's failure was an unwillingness, rather than simply an inability, to cooperate, other than vague hints that De Cecco was 'cooking the books.'"); Ferro Union, 44 F. Supp.2d at 1331 ("Commerce is obliged to explain why it concluded that a party failed to comply to the best of its ability prior to applying adverse facts, and it did not do so here."). Accordingly, this case is remanded so that Commerce may make specific findings as to whether Mannesmann acted to the best of its ability in providing information about input purchases from both affiliated and non-affiliated parties. See Ferro Union, 44 F. Supp.2d at 1331 ("In order to apply adverse facts available, Commerce must be explicit in its reasoning . . . ."). If Commerce cannot identify substantial record evidence in support of such a conclusion, it may not continue to use adverse facts available in valuing Mannesmann's billet purchases from HKM.

In remanding this determination, the Court is not holding that Commerce may not use

Mannesmann's initial failure to provide information and its later, arguably misleading, assertion as evidence of Mannesmann's failure to cooperate to the best of its ability. Rather, the Court simply finds that, as it now stands, the evidence cited by Commerce in the <u>Final Results</u>, and the explanations it provides in relation to this evidence in the <u>Final Results</u> and its Final Results Memorandum, do not meet the substantial evidence requirement laid out in 19 U.S.C. § 1677e(b) (1994). Accordingly, Commerce may use this evidence, as well as any other evidence it can identify in the record, should it continue to believe that the use of adverse facts available is warranted. <u>See</u> <u>Borden, Inc. v. United States</u>, 1998 WL 895890 (CIT 1998), at 1 (noting that, in determining whether a party has cooperated to the best of its ability, "Commerce must necessarily draw some inferences from a pattern of behavior"). Further, and if appropriate, Commerce may (but need not) request further information from Mannesmann to determine whether the billet purchase from the non-affiliated supplier, Vallourec, is evidence of an isolated oversight or a deliberate effort to keep information on related party purchases from Commerce.

**2**

### The Court May Not Consider Other Alleged Misstatements and Omissions by Mannesmann in Determining Whether Commerce's Use of Adverse Facts Available Is Justified.

As noted above, in its memorandum opposing Mannesmann's Motion For Summary Judgment, Defendant-Intervenor cites three instances where it alleges that Mannesmann, in response to Commerce questions seeking information on the "merchandise under review," deliberately tried to mislead Commerce by limiting its responses to "subject merchandise." <u>See</u> Defendant-Intervenor's Response at 18-22 (discussing Mannesmann's responses to Question II.A.6.b of the first Section D Questionnaire, Question 11 of the Supplemental Section D Questionnaire, and Question 4 of Second Supplemental Questionnaire). In addition, Defendant-Intervenor notes that, although Mannesmann did provide Commerce with an exhibit that contained some of the information on billet purchases from unaffiliated parties that Commerce

requested in Question 12 of the Supplemental Section D Questionnaire, "Mannesmann's submission (Exhibit D-4) omitted the grade information requested by Commerce, which might have permitted Commerce to discover that the purchases from unaffiliated parties were of the same grade as those also produced by Mannesmann's affiliated party." Id. at 20.

While these criticisms may be valid, in the Final Results Commerce did not cite these alleged deficiencies as grounds for applying an adverse inference to Mannesmann.[5] Thus, they constitute post hoc rationalizations of Commerce's actions, which this Court may not consider in this review. See Hoogovens Staal BV v. United States, 4 F. Supp. 2d 1213, 1219 (CIT 1998); Al Tech Specialty Steel Corp. v. United States, 947 F. Supp. 510, 514 (CIT 1996); Shieldalloy Metallurgical Corp. v. United States, 947 F. Supp. 525, 531 (CIT 1996). As this Court stated in Shieldalloy Metallurgical, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Shieldalloy Metallurgical, 947 F. Supp. at 531.

Because these reasons were not identified by Commerce in the Final Results, the Court will not evaluate whether they support Commerce's use of adverse facts available at this time. Upon remand, however, Commerce may consider this record evidence.

---

[5] As noted previously, in the Final Results Commerce cited two bases for its use of adverse facts available: (1) Mannesmann's failure to fully respond to Question II.A.6.b of the first Section D Questionnaire, and (2) Mannesmann's inaccurate response to Question 4 of the Second Supplemental Section D Questionnaire. See Final Results, 63 Fed. Reg. at 13,220. Commerce did not specifically criticize the fact that Mannesmann limited its response to "subject merchandise" in regard to Question II.A.6.b or Question 4 of the Second Supplemental Section D Questionnaire, and it did not mention any (alleged) errors made by Mannesmann in answering Questions 11 or 12 of the Supplemental Section D Questionnaire.

**3**

**Use of One Mannesmann Billet Purchase from an Unrelated
Supplier Is Rationally Related to Establishing an Arm's-Length
Value for All of Mannesmann's Billet Purchases from HKM.**

In addition to arguing that Commerce's use of adverse information available was inappropriate, Mannesmann also argues that "it would be unreasonable to permit the Department to apply punitive information to the cost of all billets based on the price of a single transaction that is not representative of Mannesmann's normal course of business."  Mannesmann's Motion at 14; see also id. at 21-22; Mannesmann's Reply at 7.  According to Mannesmann, the billet purchase that Commerce used to determine market prices was a small, exceptional purchase of a grade of billets that was not used in producing seamless pipe for the U.S. market.  See Mannesmann's Motion at 22.  Thus, Mannesmann claims, "it is inappropriate to use this grade of steel from this single sale to value all of Mannesmann's billet costs."  Id.  According to Mannesmann, if Commerce is permitted to adjust billet costs at all, this exceptional purchase should only be used to adjust the price for the same grade of billet (SPEC2H 61 and 62), since "[t]he price differential calculated by the Department for this steel grade is not reliable nor appropriate evidence for a calculated price differential for any other grade."  Id.

In response, Defendant-Intervenor argues that Mannesmann "misses the point of the adjustment" when it argues that the price differential between the affiliated and non-affiliated party transactions should not be used to adjust purchases of other steel grades from HKM.  See Defendant-Intervenor's Response at 31.  Defendant-Intervenor argues:

> Nothing in the record indicates that the price differential for another grade would be less than that actually used by the Department.  More important, failing to adjust the affiliated party transactions, as suggested by Mannesmann, would violate the Department's statutory obligations.  See 19 U.S.C. §1677b(f)(2). That Mannesmann claims to have provided its actual costs is irrelevant to a determination of what would be an arm's-length market price from an unaffiliated supplier.  The statute requires a determination of market value, not affiliated party

cost of production. 19 U.S.C. §1677b(f)(2). Moreover, the major input rule allows the Department to use the producers' actual cost only where "such cost is greater than the amount that would be determined for such input under 19 U.S.C. §1677b(f)(2)." 19 U.S.C. §1677b(f)(3). Use of market value, when higher than production costs, conforms to the statutory framework.

Id.

For its part, Defendant briefly adds that Commerce has broad discretion in choosing adverse facts available and that, in this case, its choice of facts was reasonable because it was based on actual market data for a sale to Mannesmann during the period of review. Defendant's Response at 16-17.

On its face, it is clear that Mannesmann argues that there is not a rational relationship between the data chosen (one, small-quantity billet purchase from an unrelated supplier) and the valuation of its purchases from HKM. As this Court has repeatedly stated, even when the use of facts available is appropriate, a rational relationship must exist between the data chosen and the matter to which they are to apply. Cultivos Miramonte S.A. v. United States, 7 F. Supp.2d 989, 996 (CIT 1998); National Steel Corp. v. United States, 18 CIT 1126, 1132, 870 F. Supp. 1130, 1136 (CIT 1994); Manifattura Emmepi S.p.A. v. United States, 16 CIT 619, 623-24, 799 F. Supp. 110, 115-16 (1992).

In this case, substantial evidence shows that such a relationship does exist, at least for purposes of using "adverse" facts available.[6] As discussed in Section III.B., Commerce correctly interpreted 19 U.S.C. § 1677b(f)(2) and (3) as giving it the authority to use the highest of transfer

---

[6] As discussed below in Section III.C.4, should Commerce determine that its use of adverse facts available cannot be justified, the likelihood exists that Commerce may use data other than Mannesmann's (SPEC2H 61 and 62) billet purchase from Vallourec as "facts available." Given this reality, the Court does not currently address the issue of whether, outside the context of using "adverse" facts available, Commerce's use of one billet purchase from Vallourec is rationally related to the establishment of an arm's-length value for Mannesmann's billet purchases from HKM.

price, cost of production, or market value in valuing Mannesmann's billet purchases from HKM. Because it determined that the major input rule (19 U.S.C. § 1677b(f)(3) (1994)) was not applicable, since HKM's cost of production was below the transfer price reported by Mannesmann, Commerce relied on § 1677b(f)(2) to value the inputs. Section 1677b(f)(2) requires Commerce to determine whether the prices HKM charged Mannesmann for billets fairly reflected market values and, if they did not, use information available concerning market prices to value the transactions. In line with this mandate, for the Final Results Commerce used the sole instance where it found that Mannesmann had purchased the same grade of steel from both HKM and a non-affiliated party as the basis for adjusting all of HKM's billet purchases.

While such an adjustment may lead to market prices for Mannesmann's related party transactions that, in reality, are too high, the Court does not find such a means of estimating market value lacking in rationality. Rather, a close nexus exists between the data chosen and the matter to which it applies since, essentially, Commerce did no more than use available record evidence of a market price to help it approximate other market prices.[7]

In light of this conclusion, should Commerce demonstrate on remand that the use of adverse best information available is still appropriate, the Court will sustain, as supported by substantial record evidence, the rationality of using the billet purchase (SPEC2H 61 and 62) from Vallourec as a means of determining market values for all of Mannesmann's billet purchases from HKM.

---

[7] The Court also notes that use of this value would be consistent with the purpose of adverse facts available, which is to ensure that an uncooperative party "does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action Accompanying the URAA ("SAA"), H.R. Doc. No. 103-316, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199.

**4**

### The Court Will Not Consider Whether Commerce's Calculation of Market Value Is Sustainable as a Facts Available, As Opposed to an Adverse Facts Available, Determination.

In its memorandum opposing Mannesmann's Motion For Summary Judgment, Defendant-Intervenor argues that:

> Contrary to Mannesmann's claim, Commerce's valuation of the billets at issue here not [sic] a punitive application of adverse facts available. Indeed, Commerce's valuation finding need not have been characterized as adverse and is sustainable as a facts available determination.

Defendant-Intervenor's Response at 18.

Regardless of the merit of this position, this Court should not, and will not, consider it at this point in the litigation. For the Final Results, Commerce made clear that it was using data from one purchase of billets from an unaffiliated supplier as "adverse facts available" in making a 30.9% price adjustment to Mannesmann's purchases from HKM. See Final Results, 63 Fed. Reg. at 13,220; Final Results Memo. at 15. Nowhere did Commerce indicate that it was also, or alternatively, using this data on the basis of "facts available." For this reason, the Court recognizes that, should Commerce conclude upon remand that it cannot continue to apply adverse facts available, Commerce will not necessarily continue to apply the same data. Rather, the likelihood exists that Commerce will choose other figures, or request further information, that it may use as "facts available." In light of these possibilities, it would be inappropriate for the Court to currently consider the issue of whether Commerce's reliance on one purchase of billets from an unaffiliated supplier is sustainable on a "facts available," as opposed to an "adverse facts available," basis.

**D**

**Commerce's Use Of Adverse Facts Otherwise Available To Value Mannesmann's U.S. Duty Amounts Is Not Supported By Substantial Record Evidence.**

The final point of contention between the parties concerns the customs duties that Mannesmann, in response to Section C of Commerce's Antidumping Questionnaire, reported as having paid on its U.S. sales. As discussed above, at verification Commerce discovered that Mannesmann had underreported its U.S. duties paid on a number of entries, and that Mannesmann could not recreate the allocation methodologies it used to derive its figures. See Final Results, 63 Fed. Reg. at 13,222. In light of these problems, Commerce used the highest U.S. duty amounts reported by Mannesmann for those instances where it was unable to exactly verify Mannesmann's figures. Id.

Though not specifically presented as such, Plaintiffs appear to challenge three aspects of Commerce's calculation of Mannesmann's U.S. duty amounts: (1) Commerce's initial decision to reject the U.S. duty amounts reported by Mannesmann in favor of facts available; (2) Commerce's decision to use "adverse" facts available; and (3) Commerce's use of impermissibly punitive figures as adverse facts available. For the reasons below, the Court remands this case to Commerce on the grounds that its use of "adverse" facts available is not supported by substantial record evidence.

**1**

**Commerce's Use of Facts Available to Value Mannesmann's U.S. Duty Amounts Is Supported by Substantial Evidence.**

Mannesmann first challenges Commerce's use of its highest reported U.S. duty amounts on the grounds that "the discrepancies between reported and verified data were minimal and did not justify rejection of actual information." Mannesmann's Motion at 27. According to

Mannesmann, because subject and non-subject merchandise were generally present in the same customs entry, it had to allocate duties paid for purposes of Commerce's investigation. Id. Also, allocations had to be made for harbor maintenance and merchandise processing fees. Id. Accordingly, Mannesmann argues, "[i]n performing these allocations, percentages had to be calculated and applied, and rounding decisions had to be made. It is not surprising, therefore, that minor discrepancies arose in Mannesmann's duty calculations compared with the Department's calculations at verification." Id.

In addition to explaining why it was reasonable that the figures it reported as U.S. duties paid differed from those Commerce calculated, Mannesmann further argues that the discrepancies identified by Commerce were de minimis. According to Mannesmann, for the 52 percent of subject merchandise examined by Commerce, Commerce found discrepancies ranging from $.07 to $.98 cents per ton. Id. at 28. On a percentage basis, this underreporting ranged from a high of 1.6 % of duties paid (per ton) to a low of 0.1 % of duties paid, and the weighted average discrepancy equaled only 0.22 % of duties paid. Analysis of U.S. Duty Adjustment, id., Ex. A. Because these errors were so minor, and because Commerce was able to tie Mannesmann's reported data to its "financials," Mannesmann argues that "the Department's total rejection of the reported duty due to minor discrepancies with the verified duty paid is unwarranted." Id. at 29.

In response, Defendant briefly asserts that Commerce was justified in using adverse facts available pursuant to 19 U.S.C. § 1677e(a) because it was unable to verify the amounts of U.S. duty reported by Mannesmann. According to Defendant, Commerce's finding that Mannesmann failed to cooperate to the best of its ability "is clearly supported by the record because Mannesmann possessed the source documentation, such as Customs entry forms and payment records. It simply failed to report the accurate amounts of U.S. duty." Defendant's Response at

28.[8] Defendant also argues, in its supplemental brief, that as "[n]o statute or regulation authorizes or requires Commerce to disregard de minimis errors . . . or specifies what constitutes de minimis errors for determining whether a party has complied with an information request. . . . Commerce . . . will make its determination of whether to apply facts available on a fact- and case- specific basis." Defendant's Brief On The Issue Of What Constitutes A De Minimis Error For Determining Whether A Party Has Complied With An Information Request From Commerce at 3.

Pursuant to 19 U.S.C. § 1677e(a)(2)(D) and § 1677m(e)(2) (1994), Commerce may disregard information submitted by a party that cannot be verified and substitute facts available. In this case, Commerce found that it was unable to exactly verify the U.S. duty amounts reported by Mannesmann and, consequently, resorted to facts available. Although Commerce has considerable discretion in deciding whether a party has sufficiently replied to an information request, Helmerich, 24 F. Supp.2d at 308, this discretion is not unfettered. For instance, this Court has found Commerce's use of best information available (now "facts otherwise available") to be arbitrary and an abuse of discretion where a respondent failed to give information that did not exist, or where Commerce did not adequately request the information at issue. See Outokumpu Copper Rolled Products AB v. United States, 17 CIT 848, 867-68, 829 F. Supp. 1371, 1386-87 (1993).

Against this background, the fact that Commerce, on the basis of what are essentially minimal, non-consequential deviations, found that it was unable to verify Mannesmann's reported duty rates -- and, on this grounds, disregarded them -- gives the Court pause. Such a rigid verification process appears to be in conflict with Commerce's normal practice of ignoring de minimis errors, see, e.g., Notice of Final Determination of Sales at Less Than Fair Value:

---

[8] Defendant's comments on this part of the Final Results, like those of Defendant-Intervenor, deal almost exclusively with the issue of why the use of "adverse" facts available was appropriate.

  Small Diameter Circular Seamless Carbon and Alloy Steel, Standard, Line and Pressure Pipe From Italy, 60 Fed. Reg. 31,981, 31987 (1995) (minor discrepancies between the respondent's actual freight expenses and the reported freight expenses did not warrant the use of best information available), and, without more, might constitute an abuse of discretion. Cf. NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208-09 (Fed. Cir. 1995) (noting, in regard to Commerce's refusal to consider a request for correction of clerical errors, that "[w]hile the parties must exercise care in their submissions, it is unreasonable to require perfection").

        In this instance, however, not only did Mannesmann's figures slightly vary from those calculated by Commerce, but Mannesmann was unable to recreate or explain at verification the method by which it arrived at its results.  As such, Commerce was unable to examine Mannesmann's methodology, compare it to its own, and determine why Mannesmann's reported duties were slightly lower than those calculated by Commerce in most instances.  In light of this inability to verify Mannesmann's calculation methods, the Court finds Commerce's decision to use appropriate facts available to be supported by substantial record evidence, despite the relative insignificance of the errors involved.


**2**

**Commerce's Use of "Adverse" Facts Available Is Not
Supported by Substantial Evidence.**

        While the discrepancies Commerce identified at verification are sufficient to support its use of appropriate facts available, these errors do not provide substantial evidence to support Commerce's use of "adverse" facts available.

        As discussed previously, once Commerce finds that it may resort to facts available, it may apply an adverse interest in choosing among facts available if it can show that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for

information." 19 U.S.C. § 1677e(b) (1994). In this instance, and in contrast to its finding concerning the valuation of Mannesmann's billet purchases, Commerce appears to have adequately laid out its reasons for concluding that Mannesmann failed to act to the best of its ability. Commerce found that Mannesmann had repeatedly underreported its U.S. duties paid, and that such a pattern of underreporting "indicates that errors exist which are more pervasive than can be explained by rounding or allocation methodologies." Final Results, 63 Fed. Reg. at 13,222. In addition, Commerce noted that "the company could not recreate or explain the allocation methodologies used in its submission." Id. While it could have been stated more directly, it seems clear from these statements that, in Commerce's view, the discrepancies it identified at verification were evidence that Mannesmann had willfully not reported correct figures. See AK Steel Corp. v. United States, 988 F. Supp. 594, 607 (CIT 1997), aff'd 1999 WL 504236 (Fed. Cir. 1999) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281 (1974)) ("The Court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'").

Notwithstanding the adequacy of this explanation, however, the evidence identified by Commerce does not provide substantial evidence that Mannesmann "failed to cooperate by not acting to the best of its ability to comply with a request for information." See 19 U.S.C. § 1677e(b) (1994). In determining whether a party has acted to the best of its ability for purposes of 19 U.S.C. § 1677e(b) (1994), Commerce, like this Court, must interpret this provision in light of the principle that the law does not care for, or concern itself with, small or trifling errors. As the Supreme Court made clear in Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 231 (1992), "the venerable maxim de minimis non curat lex ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." This maxim of statutory construction applies with equal force to the interpretation of customs and trade laws. See Alcan Aluminum Corp. v. United States, 165 F.3d 898 (Fed. Cir. 1999) (applying Wrigley to country-of-origin determination); Washington Red Raspberries Comm'n v.

United States, 859 F.2d 898 (Fed. Cir. 1988) (finding dumping margins of less than 0.5% to be de minimis); Industria de Fundicao Tupy v. United States, 20 CIT 870, 882-83, 936 F. Supp. 1009, 1019-20 (1996) (recognizing the doctrine of de minimis non curat lex in holding that "[b]ased on Plaintiffs' assertion that its transactions are 'insignificant' . . . the Court also dismisses [Plaintiffs'] Complaint pursuant to the long stated proposition that it should not bother with trifles").

Unless a statute sets out specific guidelines,[9] the question of whether an activity is a de minimis derivation from a prescribed standard must be determined in reference to the purpose of the standard. Wrigley, 505 U.S. at 232. As stated in the Statement of Administrative Action that accompanied the Uruguay Round Agreements Act, "Commerce's potential use of [facts available] provides the only incentive to foreign exporters and producers to respond to Commerce questionnaires." SAA, H.R. Doc. No.103-316, at 868, reprinted in 1994 U.S.C.C.A.N. at 4198.[10] Consistent with this goal of ensuring compliance, the SAA states that, where a party has been uncooperative, Commerce "may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Id. at 870, reprinted in 1994 U.S.C.C.A.N. at 4199. The SAA further provides that "[i]n employing adverse inferences, one factor the agencies will consider is the extent to which a party may benefit from its own lack of cooperation." Id.

Viewing Mannesmann's errors in light of this "purpose" for applying adverse facts available, the Court finds Mannesmann's errors to be de minimis. While it is true that the U.S.

---

[9] No specific statute or regulation defines what constitutes a de minimis error for purposes of determining whether a party has complied with an information request or acted to the best of its ability.

[10] 19 U.S.C. § 3512(d) (1994) provides that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application."

duties reported by Mannesmann were lower than those calculated by Commerce in most instances, the degree of these variances was generally trifling. As Mannesmann makes clear in its brief, the weighted average discrepancy found by Commerce equaled only 0.22 % of duties paid. Analysis of U.S. Duty Adjustment, Mannesmann's Motion, Ex. A. Further, in 89% of those instances where Commerce found that Mannesmann had underreported its duties paid, the discrepancy from the numbers calculated by Commerce equaled 0.1% of the duty paid. See id.[11] Only 11% of the discrepancies found equaled more than 1% of the duty paid, see id.,[12] and in three instances Commerce found no discrepancies, see Final Results, 63 Fed. Reg. at 13,222; Final Results Memo. at 12.

Given the limited nature of these errors, the Court does not find substantial evidence to support Commerce's conclusion that "errors exist which are more pervasive than can be explained by rounding or allocation methodologies" and its related decision to use adverse facts available. As noted above, the purpose of using an adverse inference is to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA, H.R. Doc. No.103-316, at 870, reprinted in 1994 U.S.C.C.A.N. at 4199. In this case, the limited amounts by which Commerce found that Mannesmann had underreported its U.S. duties presumably would not have had any substantive effects upon the calculation of the U.S. price for Mannesmann's products, and Defendant has not identified any record evidence to indicate otherwise. Accordingly, errors in the figures Mannesmann provided would have given it almost

---

[11] According to Mannesmann's exhibit ("Analysis of U.S. Duty Adjustment"), sales observations 1,5,6, and 8-11 were underreported by 0.1%. These observations accounted for **[confidential #]** of the **[confidential #]** tons of product that Commerce found to have been underreported, or approximately 89%. The Court notes, however, that because Commerce was able to verify Mannesmann's reported duties for three sales, Final Results Memo. at 12, the frequency with which the duties reported by Mannesmann either equaled, or were within 0.1%, of the figures calculated by Commerce was likely at or above 90%.

[12] Sales observations 45, 46, 49-51, 53 and 54 (accounting for **[confidential #]** tons of product) were underreported by 1.1%, while sales observations 84-91 (**[confidential #]** tons) were underreported by 1.6%. These observations accounted for **[confidential #]** of the **[confidential #]** tons of product that Commerce found to have been underreported, or approximately 11%.

no advantage compared to the "correct" figures calculated by Commerce.

Further, although Commerce noted that Mannesmann could not recreate or explain the allocation methodologies it used for its submission during verification, the record does not show that Mannesmann kept any of the information underlying its conclusions from Commerce. Rather, Mannesmann provided Commerce with the relevant source documentation, and Commerce was able to compute its own, nearly identical, figures for the U.S. duties paid by Mannesmann. See U.S. Sales Verification Report, dated 09/02/97, Conf. AR-57, Mannesmann Appendix, App. 10, at 21-26. Given Mannesmann's willingness to provide this information (and given how close the figures provided by Mannesmann were to those calculated by Commerce), this does not appear to be a situation where Mannesmann tried to obtain a more favorable result by not providing relevant information. In fact, substantial record evidence supports an opposite conclusion.

In light of the foregoing, the Court finds that Commerce's decision to apply an adverse inference in this case is not supported by substantial record evidence. While the figures reported by Mannesmann were generally lower than those calculated by Commerce, the differences between the figures were so small that they could not reasonably be viewed as evidence of non-cooperation by Mannesmann. See Notice of Final Determination of Sales at Less Than Fair Value; Stainless Steel Plate in Coils From South Africa, 64 Fed. Reg. 15,459, 15,463 (1999) (finding that, although the respondent committed "a number of errors" and "in certain cases failed to follow the instructions provided," Commerce generally "continued to rely upon [respondent's] submitted sales and cost data, adjusted appropriately for any errors or omissions on [respondent's] part"). Mannesmann also appears to have supplied Commerce with all its relevant source data; a fact which undermines any idea that Mannesmann was purposefully withholding data in order to obtain a more favorable outcome.

Accordingly, this aspect of the Final Results is remanded so that Commerce may identify

other record evidence to support its use of "adverse" facts available. In order to do this, Commerce may, at its discretion, calculate the duties paid on the entries that it did not review at verification and compare its figures to the duty amounts reported by Mannesmann. Should Commerce be unable to, or choose not to, identify such substantial evidence, it may only use reasonable, non-adverse facts available[13] to value the U.S. duties paid by Mannesmann.[14]

## IV

## CONCLUSION

For the foregoing reasons, the Court finds that although Commerce correctly interpreted 19 U.S.C. § 1677b(f)(2) and (3) (1994), its use of adverse facts available to value Mannesmann's billet purchases from HKM was neither in accordance with law nor supported by substantial record evidence. The evidence cited by Commerce in the Final Results, and the explanation it provides in relation to this evidence, do not demonstrate that Mannesmann failed to cooperate to the best of its ability in this aspect of the investigation, as required by 19 U.S.C. § 1677e(b) (1994). Accordingly, this aspect of the Final Results is remanded so that Commerce may

---

[13] A reasonable choice of facts available may include use of the figures provided by Mannesmann (subject to necessary adjustments), use of the figures calculated by Commerce (where available), or the use of any other record evidence which bears a rational relationship to the calculations of the U.S. duties paid by Mannesmann, see Koenig & Bauer-Albert AG v. United States, 15 F. Supp.2d 834, 846 (CIT 1998), and is otherwise in accordance with law and supported by substantial evidence. Similarly, Commerce may use record evidence to calculate U.S. duties for those Mannesmann sales that it did not attempt to review at verification, if appropriate. That said, however, the Court notes that these possible alternatives are only suggestions; the ultimate choice of facts available is a matter largely reserved to Commerce's discretion. See Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993) (recognizing that, as Congress did not explicitly define what constitutes BIA (now facts otherwise available), Commerce's "construction of the [BIA] statute must be accorded considerable deference").

[14] Because substantial record evidence does not support Commerce's decision to apply adverse facts available, the Court need not reach the question, raised by Plaintiffs, of whether the adverse information chosen by Commerce was impermissibly punitive.

reconsider its conclusion, or more specifically articulate why it concluded, that Mannesmann failed to act to the best of its ability in providing information about input purchases from both affiliated and non-affiliated parties. See Ferro Union, 44 F. Supp.2d at 1331 ("In order to apply adverse facts available, Commerce must be explicit in its reasoning . . . .").

Similarly, and in light of the de minimis nature of the errors at issue, the Court also finds that the record evidence identified by Commerce does not adequately support its conclusion that Mannesmann failed to cooperate to the best of its ability (and, in turn, that the use of adverse facts available was appropriate). Thus, this aspect of the Final Results is also remanded for further consideration by Commerce. Upon remand, Commerce may seek to identify other record evidence to support its use of "adverse" facts available, or, should it choose (or be unable) to do so, it may use non-adverse record evidence to value the U.S. duties paid by Mannesmann.

_____

Evan J. Wallach, Judge

Date:   October 29, 1999
        New York, New York