SLIP-OP 03 - 23

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                                    :
CITIC TRADING CO., LTD, ET AL.,                     :
                                                    :
              Plaintiffs,                           :
                                                    :
              v.                                    :        PUBLIC
                                                    :
UNITED STATES,                                      :        Before:   WALLACH, Judge
                                                    :        Court No.: 01-00901
              Defendant,                            :
and                                                 :
                                                    :
ABC COKE, CITIZENS GAS & COKE                       :
UTILITY, ERIE COKE CORP., SLOSS                     :
INDUSTRIES CORP., and TONAWANDA                     :
COKE CORPORATION,                                   :
                                                    :
              Defendant-Intervenors.                :
_____:

[Remanded]


                                                    Decided: March 4, 2003


Manatt, Phelps & Phillips, LLP (Jeffrey S. Neeley), for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Lucius B. Lau,
Assistant Director; John N. Maher, Trial Attorney; William J. Kovatch, Jr., Office of Chief
Counsel for Import Administration, U.S. Department of Commerce, of counsel, for Defendant.

Schagrin Associates (Roger B. Schagrin), for Defendant-Intervenors.


1

**OPINION**

**WALLACH, Judge.**

**I**

**Introduction**

Plaintiffs CITIC Trading Co., Ltd., Minmetals Townlord Technology Co., Ltd., and Sinochem International Co., Ltd. (collectively "Plaintiffs" or " Respondents") move for judgment upon the agency record pursuant to USCIT Rule 56.2, challenging the decision of the United States Department of Commerce, International Trade Administration (the "Department," "Commerce" or "ITA") in Final Determination of Sales at Less Than Fair Value: Foundry Coke Products From The People's Republic of China, 66 Fed. Reg. 39487 (July 31, 2001) ("Final Determination").

Plaintiffs challenge five aspects of the Final Determination: (1) the Department's choice of surrogate values for coking coal; (2) the Department's finding that foreign producers reported coal usage amounts subsequent to washing; (3) the Department's use of adverse inferences based on non-cooperation by producers; (4) the Department's refusal to use surrogate values from related coal mines; and (5) the Department's use of adverse inferences against Sinochem. The Department's determination is remanded on all five issues.

# Background

On September 20, 2000, ABC Coke, Citizens Gas & Coke Utility, Erie Coke Corporation, Sloss Industries Corporation, and Tonawanda Coke Corporation (collectively "Petitioners" or "Defendant-Intervenors") filed an antidumping petition alleging that imports of foundry coke from China were being injuriously dumped in the United States. The Department initiated an antidumping duty investigation on October 10, 2000. See Initiation of Antidumping Duty Investigation: Foundry Coke From the People's Republic of China, 65 Fed. Reg. 61303 (Oct. 17, 2000). Commerce determined the scope of the investigation to be "coke larger than 100 mm (4 inches) in maximum diameter and at least 50 percent of which is retained on a 100 mm (4 inch) sieve, of a kind used in foundries." Id. at 61304. On November 7, 2000, Commerce issued Section A Questionnaires to the Embassy of the People's Republic of China ("PRC"), as well as courtesy copies to Sinochem, CITIC, Minmetals, and Shanxi Grand Coalchem Industrial Co. ("Shanxi")[1], each a foundry coke exporter. On November 14, 2000, the United States International Trade Commission ("ITC") preliminary determined that "there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports from China of foundry coke." Foundry Coke from China, 65 Fed. Reg. 69573, 69573 (Nov. 17, 2000) ("ITC Preliminary Determination").

During the preliminary proceedings, Commerce provided the parties a list of countries operating at a similar level of economic development to the PRC for purposes of surrogate value

---

[1]Shanxi is not a party to this action.

determination.[2]  Accordingly, Respondents submitted information from an Indian producer of coking coal, Bharat Coking Coal, for the relevant period of investigation running from January 1, 2000, through June 30, 2000.  Petitioners similarly determined on January 23, 2001, that India was the most appropriate surrogate country and submitted publicly-available information concerning factors of production from India.  On February 20, 2001, Commerce selected India as the primary surrogate country, noting that India was a significant producer of the subject merchandise, that Petitioners had submitted factors from Indian sources, and that India was at a level of economic development similar to the PRC.

In addition, Commerce requested that respondents provide information on their supplying foundries within the PRC.  On January 23, 2001, Sinochem, CITIC, and Shanxi submitted Section D Questionnaires from some, but not all, of their suppliers, explaining that certain suppliers had failed to respond because they had been involuntarily closed by the PRC government.  Commerce further issued Supplemental Questionnaires on January 26, 2001 requesting documentation on the closures.  In response, Sinochem, CITIC, and Shanxi provided documents from the People's Government of Qing-Xu County and the People's Government of Shanxi Province representing that certain unidentified companies had been shut down due to their use of outdated equipment.

During the preliminary proceedings, Commerce also issued a Supplemental Questionnaire to Sinochem requesting additional information on an unreported U.S. sale where a

---

[2]  These countries are: India, Pakistan, Sri Lanka, Egypt, Indonesia and the Philippines. See Notice of Preliminary Determination of Sales at Less Than Fair Value: Foundry Coke From the People's Republic of China, 66 Fed. Reg. 13885, 13889 (Mar. 8, 2001) ("Preliminary Determination").

portion of the merchandise was over 100mm in size. Sinochem responded on January 5, 2001, claiming that it had reported all sales of coke falling within the scope of the investigation. A second Supplemental Questionnaire was issued on January 26, 2001, in the response to which Sinochem confirmed that it did sell foundry coke over 100mm in size during the POI, but said that since the majority of the coke was under 100mm, the sale was not subject to the investigation.

In the Preliminary Determination, Commerce determined that foundry coke from the PRC was being sold at less-than-fair value in the United States. See Preliminary Determination, 66 Fed. Reg. at 13885. In determining surrogate values for coal, Commerce chose not to rely on Respondents' Indian coking coal prices but instead utilized Indian Import Statistics for the period of April 1998 through March 1999. Id. at 13890. Pursuant to 19 U.S.C. §1677e(b), Commerce applied adverse facts available against Sinochem for failure to report its sale containing coke over 100mm in size. 66 Fed. Reg. at 13889. Finally, Commerce determined that respondents did not act to the best of their ability to obtain section D responses from their suppliers and resorted to adverse facts available for exporters who purchased from those companies.[3] Id.

In order to address Department's use of alternative coking coal prices, on May 1, 2001, respondents submitted additional coking coal prices from Coal Week International. Arguing that import prices relied upon by Commerce in the Preliminary Determination were imprecise and unreliable, respondents requested that Commerce use a basket of coking coal prices from

---

[3] According to Commerce, the non-responsive suppliers failed to adequately establish that they "were in fact shut down by the government since the government document did not provide names of the foundry coke producers subject to the governmental decree or any other information that would suggest that any specific company had been shut down." Preliminary Determination, 66 Fed. Reg. at 13889.

5

comparable countries such as South Africa, Indonesia, Colombia, Venezuela and Poland.

In addition, Respondents also arranged for Chinese government officials to meet with Department's investigators to provide assurances of the credibility of the shutdowns and to counter Commerce's use of adverse facts available on the issue. Although Commerce met with the officials and they offered various documents to support their statements, Commerce did not accept any of the documents, claiming they would constitute new information on the record.

Commerce published its Final Determination and accompanying Issues and Decisions Memorandum ("Decision Memorandum")[4] on July 31, 2001. Final Determination, 66 Fed. Reg. 39487. In the Decision Memorandum, Commerce again rejected Respondents' submission of surrogate values for coking coal, preferring instead to continue using Indian Import Statistics for the period of April 1998 to March 1999. Id. As in the Preliminary Determination, Commerce continued using adverse facts available against those exporters that could not provide evidence substantiating that some of their suppliers had closed. Commerce explained that the continued application of adverse facts available was appropriate since respondents failed to submit information in a timely manner and in the requested form. As for Sinochem's unreported sale, Commerce did not apply adverse facts available but rather applied facts available by conducting a "margin analysis" on the portion of the sale considered in-scope, "using the price of the original sale and the volume of the sale which exceeds 100mm in size." Decision Memorandum at Comment 12.

---

[4] Commerce's Final Determination was further amended due to ministerial errors in Notice of Amended Final Determination of Sales at Less Than Fair Value: Foundry Coke From the People's Republic of China, 66 Fed. Reg. 45962 (Aug. 31, 2001), and Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Foundry Coke Products From The People's Republic of China, 66 Fed. Reg. 48025 (Sept. 17, 2001).

In addition, Commerce also determined that Respondents reported coking coal inputs at stages subsequent to the washing. This conclusion was based on Respondents' questionnaires responses submitted earlier during the proceedings where respondents reported that they washed the coal themselves but recycled the by-product of the washing process, i.e. coal mud, into the production of coke. Commerce therefore determined that "the reported usage rates are for washed coal, and there is no need to adjust the coal factors to account for washing." Id. at Comment 2. Finally, Commerce determined that, contrary to respondents' contentions,[5] it would not determine a surrogate value for coal obtained from related coal mines by using a factors of production methodology. Commerce did not "consider that coal is a self-produced input for any of the respondents," so it "did not value coal using the factors of production for coal from the coal mines." Id. at Comment 3.

On September 14, 2001, the ITC determined "that an industry in the United States is materially injured by reason of imports from China of foundry coke." Foundry Coke from China, 66 Fed. Reg. 47926, 47926 (Sept. 14, 2001) ("ITC Final Determination"). On October 17, 2001, Plaintiffs filed the present action to contest the Department's Final Determination that foundry coke from the PRC was being sold at less-than-fair value in the United States.

---

[5] Respondents argued that the Department's practice is to calculate a surrogate value of the producer's inputs using surrogate prices for the actual inputs for the mining of the coal. They further argued that statutory provisions state that Commerce is to determine normal value using the factors of production of the merchandise. Consequently, respondents argue they acted according to Department's practice and statutory provisions in providing inputs of coking coal for both related and unrelated mines, including the factors of production for coking coal supplied by related mines.

7

## III.

### Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

In reviewing the Final Determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 USC § 1516a (b)(1)(B) (1994). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F.Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A., 10 CIT at 404-5.

## IV.

## Discussion

## A.

## A Remand is Necessary Because The Department's Final Determination Is Not Supported by Substantial Evidence

Plaintiffs challenge five aspects of the Final Determination: (1) the Department's choice of surrogate values for coking coal; (2) the Department's finding that foreign producers reported coal usage amounts subsequent to washing; (3) the Department's use of adverse inferences based on non-cooperation by producers; (4) the Department's refusal to use surrogate values from related coal mines; and (5) the Department's use of adverse inferences against Sinochem. Because the court finds that the Final Determination is unsupported by substantial evidence, the Court concludes that remand is proper on all five issues. A detailed review of the parties' contentions follows.

## 1.

## The Department's Choice of Surrogate Values Is Not Supported by Substantial Evidence

## a.

## Commerce Agrees That The Surrogate Value Date Upon Which It Relied Contains Errors

Plaintiffs dispute the Department's choice of surrogate values for coking coal as

unsupported by the record, falling outside of the period of investigation, and unreflective of coal prices produced within PRC. More specifically, Plaintiffs argue that the Department's reliance on Indian Import Statistics for the period of April 1998 to March 1999 is unsupported by substantial evidence because: (1) the prices used by Commerce are uncorroborated by the record and inconsistent explanations were provided as to what source documentation might show; (2) Commerce used coal prices outside of the period of investigation without taking into consideration the commodity's volatile nature; (3) Commerce failed to use prices from an authoritative source on the record that is both contemporaneous to the period of investigation and for coal produced and sold in economies of comparable levels of development to the PRC; and (4) Commerce used prices that were reflective of coal produced in non-comparable economies.

To support their contention as to the unreliability and inconsistencies in Commerce's use of surrogate prices, Plaintiffs cite to the Decision Memorandum as well as various documents generated by Commerce in reaching its Final Determination.[6] In comparing the Decision Memorandum, the CITIC Analysis Memo and its supporting documents, Plaintiffs point to inconsistent listings of time periods for valuing coal input, and conflicting uses of value

---

[6] See Analysis for the Final Determination of Foundry Coke from the People's Republic of China: CITIC Trading Company, Ltd., A.R. (Non-public) Doc. No. 111 ("CITIC Analysis Memo"); Analysis for the Final Determination of Foundry Coke from the People's Republic of China: Sinochem International, A.R. (Non-Public) Doc. No. 110 ("Sinochem Analysis Memo"); Analysis for the Final Determination of Foundry Coke from the People's Republic of China: Shanxi DaJin, A.R. (Non-public) Doc. No. 113 ("Shanxi Analysis Memo"); Analysis for the Final Determination of Foundry Coke from the People's Republic of China: Minmetals Townlord, A.R. (Non-public) Doc. No. 112 ("Minmetals Analysis Memo") (collectively "Analysis Memoranda"); Plaintiffs' Memo at 15-17.

inflators and surrogate prices.[7]  Plaintiffs also cite to discrepancies in the Sinochem Analysis

Memo where the purportedly inflated values are not reflected in the supporting documents' listed

values.[8]  Finally, Plaintiffs point to the Shanxi Analysis memo, where coal inputs are for

inconsistent periods, and the Minmetals Analysis Memo, where coal prices and input periods

conflict between the actual memo and its supporting documents.  Plaintiffs argue that all these

figures are unreliable because no source documents were provided for the asserted values.

Plaintiffs also argue that the Department has failed to follow its own preference for using

surrogate data that is contemporaneous with the period of investigation.[9]  According to Plaintiffs,

it is the accuracy of the determination that is of paramount concern to the Antidumping statute,

and where prices from one source are shown to be distorted, DOC practice is to turn to another

source.  Rhodia, Inc. v. United States, 185 F. Supp. 2d 1343, 1352 (CIT 2001).  Plaintiffs claim

that the data they submitted is more accurate since it is contemporaneous with the period of

investigation and contains prices for merchandise from comparable surrogate countries.  While

---

[7] In the CITIC Analysis memo, Commerce states that it based its determination on "coal input based on the Indian Import Statistics for the period of April 1998 to May 1999." Plaintiffs' Memo at 15-16.  Commerce further states that it inflated this value with International Financial Statistics, resulting in a surrogate value for coal of $59.82.  Plaintiffs argue that this statement directly conflicts with the Issues and Decision Memorandum, where Commerce stated that it used data from a time contemporaneous to the period of investigation, i.e. January 1, 2000, through June 30, 2000.  Plaintiffs also argue that it conflicts with Attachment I to the CITIC Analysis Memo which is based on the Monthly Statistics of the Foreign Trade of India for April 2000-September 2000, and has no inflated values as in the main memo.

[8] As in the CITIC Analysis Memo, the Sinochem Analysis memo states that coal input is based on Indian Import Statistics for the period of April 1998 to May 1999, and that the resulting values are inflated with International Financial Statistics.  The supporting documents in Attachment I, however, list coking coal prices at the non-inflated value of $45.54.

[9] The period of investigation ran from January 1, 2000, to June 30, 2000.

11

they admit that their prices are from numerous other developing countries, Plaintiffs argue they are still appropriate as "[i]t has been longstanding DOC practice to use prices from a basket of countries in appropriate circumstances."[10] Plaintiffs' Memo at 19. Accordingly, they conclude that in refusing to use the data they submitted and providing no source documentation for its surrogate prices, Commerce has "failed to follow its own preference and the requirement that it use the most accurate information available." Id. at 18.

Finally, Plaintiffs argue that Commerce has failed to provide any specifications as to the nature of the coking coal upon which it based its surrogate value determination. They note that Commerce had already previously rejected Plaintiffs' submission of coal prices, which were from an Indian Producer of coking coal and set contemporaneously to the period of investigation. This decision was based on the fact that the specifications of that coking coal were of a "significantly lower quality of coking coal than that which is actually used by foundry coke producers." Preliminary Determination, 66 Fed. Reg. at 13890. Plaintiffs therefore conclude that Commerce has acted inconsistently in its own findings since "[n]othing on the record allows DOC to know whether the coking coal import prices that it has used were for coal similar to that used in China or for a far different product." On this basis, Plaintiffs argue that the court should remand Commerce's final determination on surrogate values because the use of Indian Import Statistics for the period of April 1998 - May 1999 is unsupported by the record and not sufficiently

---

[10] Plaintiffs cite to the Issues and Decision Memorandum accompanying Manganese Metal from the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 66 Fed. Reg. 15076 (Mar. 15, 2001), where Commerce stated that "where the facts on record indicate that the Department's usual practice would not permit the accurate valuation of a factor input, the Department has chosen surrogates from countries not included among the Department's list of potential surrogate countries." Plaintiff's Memo at 19.

contemporaneous to the period of investigation.

Defendant-Intervenors, in turn, argue that Department's decision to use Indian Import Statistics rather than Plaintiffs' price quote from Coal Week International is supported by substantial evidence "because the source was from [a] primary surrogate [country], India, that is publicly available, sufficiently contemporaneous, specific to the input in question, and sufficiently reliable." Defendant-Intervenors' Brief in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Defendant-Intervenors' Brief") at 9 (quoting Decision Memo at Comment 1). Accordingly, they say, Commerce "had no need to turn to another surrogate country to obtain a value for coking coal." Defendant-Intervenors' Brief at 10. They further argue that Commerce properly determined the price quotes from Coal Week International to be improper since the data is not from a publicly available source and, contrary to the Indian Import Statistics, is only based on "the average of two spot price quotes from unidentified companies." Id. at 10 (quoting Decision Memorandum at Comment 1).

Finally, Defendant-Intervenors argue that the alleged inconsistencies regarding the source of surrogate values are merely reflective of Commerce's inadvertent mislabeling of supporting data. Although Department identified two different dates throughout the analysis memoranda,[11] an "[e]xamination of the coking coal value derived from the Indian Import Statistics used to calculate the final margins for each of the four respondents demonstrates . . . that the Department used a surrogate value derived from the period of April 2000 - September 2000." Id. at 10. Defendant-Intervenors also argue that, contrary to Plaintiffs' assertions, the April 2000 - September 2000 statistics were made part of the record in the underlying investigation.

---

[11] April 1998 - May 1999 and April 2000 - September 2000.

13

According to Defendant-Intervenors, they were referenced "on the record throughout the final analysis memoranda for CITIC, Shanxi Dajin, and Minmetals," and Commerce "stated in the Final Determination that it had relied on similar data in other investigations, including Certain Hot-Rolled Carbon Steel Flat Products from the People's Republic of China, Inv. No. A-570-865." Id. at 11-12; see also Decision Memorandum at Comment 1.

On this basis, Defendant-Intervenors conclude that the court should uphold Department's use of surrogate value information on coking coal from the Indian Import Statistics from April 2000 - September 2000, as this data was sufficiently contemporaneous to the period of investigation and from a publicly available source often utilized in PRC investigations.

Defendant admits to numerous inconsistencies in the administrative record. Nonetheless, Defendant argues that an examination into the mislabeled surrogate values demonstrates that the source of the data is for the period of April 2000 through September 2000, rather than April 1998 through May 1999. According to Defendant, "the differences in the identification of the source data in the memoranda and calculation charts is most likely attributable to clerical error." Defendant's Memo at 15. Defendant argues that "the Court should remand this issue so that Commerce may reopen the administrative record, clarify clerical errors due to administrative oversight, make the Indian Import Statistics for the period April 2000 through September 2000 a matter of record, and allow for commentary." Id. at 16.

**b.**

**The Record Evidence Does Not Provide a Reasonable Basis For Commerce's Selection of**

**Surrogate Values**

The antidumping law provides the standard by which Commerce is to establish normal value for merchandise exported from non-market economies. Section 773(c)(1) of the Tariff Act of 1930 directs Commerce to base normal value on the non-market economy producer's factors of production. 19 U.S.C. §1677b(c)(4)(1999). These factors are to be valued, to the extent possible "in one or more market economy countries that are: (A) at a level of development comparable to that of the nonmarket economy country, and (B) significant producers of the comparable merchandise." 19 U.S.C. §1677b(c)(4).

Commerce must also value the factors of production "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. §1677b(c)(1). While the statute does not define "best available information", it "grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 2001 CIT 96, 166 F. Supp. 2d 608, 616 (2001).[12]

---

[12] This discretion, however, is constrained by the underlying objective of the statute; to obtain the most accurate dumping margins possible. See 19 U.S.C. §1677b(c); see also Writing Instrument Mfrs. Ass'n. v. United States, 21 CIT 1185, 984 F. Supp. 629, 637 (1997). "This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." See, e.g., Allied Tube and Conduit Corp. v. United States, 132 F. Supp. 2d 1087, 1095 (CIT 2001); Usinas Siderurgicas De Minas Gerais, S.A. v. United States, __CIT__, Slip op. 98-108, 1998 Cr. Int'l Trade LEXIS 107 (July 24, 1998); AK Steel Corp. v. United States, 21 CIT 1265, 988 F. Supp. 594, 605 (1997).

While accuracy is of utmost importance, 19 U.S.C. §1677b(c) fails to indicate the time periods from which surrogate values are supposed to be taken. This court, however, has repeatedly recognized that Commerce's practice is to use surrogate prices from a period contemporaneous with the period of investigation.[13] Accordingly, while the standard of review precludes the court from determining whether Department's choice of surrogate values was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices.

The surrogate value data provided within the administrative record reveals patent inconsistencies between the various documents listing surrogate prices.[14] These discrepancies are evident in Commerce's listings of time periods for valuating coal input, its sporadic use of value inflators to reduce inequalities between comparable markets, and its final listings of surrogate prices. The parties' discussion of their source was purely speculative.

---

[13] See Shandong Huarong Gen. Corp. v. United States, 159 F. Supp. 2d 714, 728 (CIT 2001); Coalition for the Pres. of the Am. Brakedrum and Rotor Aftermarket Mfrs. v. United States, 44 F. Supp. 2d 229, 259 (CIT 1999) ("Commerce's practice is to use publicly available values which are 'representative of a range of prices within the [period of investigation]'")(quoting Union Camp Corp. v. United States, 20 CIT 931, 941 F. Supp. 108, 116 (1996). "Under normal conditions and absent evidence to the contrary, the Court presumes that Commerce acts or seeks to act in a regular manner consistent with its established practices." Shandong Huarong Gen. Corp., 159 F. Supp. 2d at 728; see also Hylsa, S.A. v. United States, 22 CIT 44 (1998)("The case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.")(quoting Pauley v. Bethenergy Mine, Inc., 501 U.S. 600, 610, 115 L. Ed. 2d 604, 111 S. Ct. 2524 (1991)); United States v. Mead Corporation, 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) ("the fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.").

[14] See e.g. A.R. (Non-Public) Doc. No. 110; A.R. (Non-Public) Doc. No. 111; A.R. (Non-Public) Doc. No. 113; A.R. (Non-Public) Doc. No. 112.

16

The parties seem to be in agreement that some form of clerical error occurred. While Plaintiffs and Defendant agree to a remand, Defendant-Intervenors recommend that the court speculate about what Commerce ultimately intended. That is beyond this court's perview and remand is necessary on the issue of surrogate values for coking coal produced in the PRC. Commerce must resolve its internal inconsistencies on this issue and select surrogate values that are sufficiently contemporaneous to the period of investigation and consistent with the objectives of 19 U.S.C. §1677b(c).

## 2.

## The Department's Finding that Foreign Producers Reported Coal Usage Amounts Subsequent to Washing is Unsupported by the Evidence

### a.

### Only Defendant-Intervenors Now Contends That Coal Inputs Were For Washed Coal

Plaintiffs challenge Commerce's determination that the foreign producers reported coal inputs at a stage subsequent to coal washing. In the Issues and Decisions Memorandum, Commerce stated that "[i]t is evident from respondents' questionnaire responses, and we further confirmed at verification, that respondents reported coking coal input quantities at the stage subsequent to coal washing." Decision Memorandum at Comment 2. Plaintiffs contend that these producers washed the coal themselves and reported all coal inputs prior to the washing stage. According to Plaintiffs, the washing process creates coal mud, which is a re-cycled input that is sometimes used in the production of coke. Plaintiffs argue that Commerce improperly

17

determined that this re-cycled product constitutes coal inputs at a stage subsequent to the washing since there is no evidence on the record for this proposition. On this basis, Plaintiffs conclude that the court should remand the Final Determination with instructions for Commerce to make an adjustment for the difference between the washed coal used by the producers and the unwashed surrogate coal prices.

Defendant-Intervenors, in turn, argue that Department's finding on coal usage amounts is supported by substantial evidence. They claim that Plaintiff's arguments "regarding coal mud by-product does not undermine the Department's decision" since other evidence on record supports the Department's conclusion. Defendant-Intervenors' Brief at 13. Defendant-Intervenors point to the questionnaires submitted by Plaintiffs and argue that because coal inputs are "based on the number of beehives that are filled with coal," and "the coal in the beehives has already undergone washing," then "the coal input that the producers reported must therefore be washed coal." Id. at 15.

In addition, Defendant-Intervenors maintain that a comparison "of the usage amount reported by a domestic producer of the subject merchandise in the petition to the Chinese producers' usage amounts clearly demonstrates that the Chinese producers reported coal input amounts of washed coal." Id. According to Defendant-Intervenors, the coal washing process "results in losses as high as 40 to 50 percent as impurities in the coal are washed away." Id. at 14. As domestic producers use washed coal and both domestic and Chinese producers reportedly use similar amounts of coal per net ton of coke produced, Defendant-Intervenors argue that "[t]he similarity of these input amounts demonstrates that the Chinese producers reported the coal usage amount subsequent to washing." Id. at 15-16. On this basis, Defendant-Intervenors conclude

18

that there is substantial evidence on the record for the court to sustain Department's

determination on coal usage amounts.

Defendant itself maintains that "[u]pon further review of the record, Commerce has

determined that it cannot support its finding" on coal usage amounts. Defendant's Memo at 17.

Defendant consequently argues that "a remand is appropriate to allow Commerce to determine

whether an adjustment is appropriate for Respondents' use of unwashed coal." Id.

**b.**

**There Is No Cognizable Evidence Of Coal Inputs At Stages Subsequent To Coal Washing**

As previously discussed, Commerce must base normal value on the non-market economy

producer's factors of production. 19 U.S.C. §1677b(c). It values these factors of production "on

the best available information regarding the values of such factors in a market economy country

or countries considered to be appropriate by the administering authority." 19 U.S.C.

§1677b(c)(1). Purportedly applying that standard, Commerce determined that there was no need

to adjust the coal factors to account for washing because "[i]t is evident from respondents'

questionnaire responses, and we further confirmed at verification, that respondents reported

coking coal input quantities at the stage subsequent to coal washing." Decision Memorandum at

Comment 2. The court, however, finds no discernable record evidence of coal inputs at stages

subsequent to the washing.[15] The questionnaire responses that producers submitted during the

---

[15] The court examined, inter alia, the producers' Section D Questionnaire Responses. See Section D Questionnaire Response of Wenshui Beizhang (Jan. 16, 2001) at D-2, A.R. (Non-public) Doc. No. 32; Section D Questionnaire Response of Wencheng International, PLC (Jan.

investigation demonstrate that the producers washed the coal themselves and recycled the by-product of this process as additional coal input.[16]  This coal input is therefore neither for washed or unwashed coal, but rather for recycled inputs directly resulting from washing already reported unwashed coal.

Defendant-Intervenors also argue that a comparison between the practices of domestic and Chinese producers would demonstrate that the latter reported coal input amounts for washed coal.  That argument was not the basis for Commerce's decision not to adjust coal input quantities.  Commerce refused to adjust the inputs because it was "evident from respondents' questionnaire responses . . . that respondents reported coking coal input quantities at the stage subsequent to coal washing." Decision Memorandum at Comment 2.  Although Commerce is afforded considerable deference, this court will not accept Defendant-Intervenors' post hoc

16, 2001) at D-3, A.R. (Non-public) Doc. No. 31; Section D Questionnaire Response of Luliang Fu Li (Jan. 19, 2001) at D-2, A.R. (Non-public) Doc. No. 39; Section D Questionnaire Response of Shanxi Yaxin (Jan. 19, 2001) at D-3, A.R. (Non-public) Doc. No. 38; Section D Questionnaire Response of Shanxi Zhongyang Shuangfe (Jan. 19, 2001) at D-2, A.R. (Non-public) Doc. No. 36; Section D Questionnaire Response of Shanxi Ju Fu (Jan. 19, 2001) at D-2, A.R. (Non-public) Doc. No. 35; Section D Questionnaire Response of Shanxi Panlong (Jan. 19, 2001) at D-2, A.R. (Non-public) Doc. No. 28; Section D Questionnaire Response of Shanxi Lishi Liangyu (Jan. 16, 2001) at D-2, A.R. (Non-public) Doc. No. 29; Section D Questionnaire Response of Jiaocheng Youse (Jan. 16, 2001) at D-2, A.R. (Non-public) Doc. No. 33; Section D Questionnaire Response of Qingxu Huaxin (Jan. 16, 2001) at D-2-3, A.R. (Non-public) Doc. No. 34; Section D Questionnaire Response of Taiyuan Genyang (Jan. 16, 2001) at D-2, A.R. (Non-public) Doc. No. 30.

[16] At oral argument, counsel for Defendant-Intervenors further argued that coal inputs were for washed coal because such inputs were based on the number of filled beehives, and such beehives were only filled with washed coal.  As counsel for Plaintiffs correctly pointed out, however, the calculation of coal inputs based on the number of beehives that are filled constitutes the normal methodology of coal input calculation, which was not relied upon in the present investigation. See Defendant-Intervenors' Appendix to their Brief in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record, App. 1 at D-4.

rationale as a basis for upholding a final determination. 19 U.S.C. §1516a(b)(1)(B)(i)(1999). Accordingly, since respondents' questionnaire responses do not support Commerce's final determination on coal inputs, a remand is necessary so that Commerce may either make an adjustment reflecting respondents' use of unwashed coal, or provide a reasonable explanation and substantial evidence for its finding on washed coal inputs.

**3.**

**The Department's Use of Adverse Inferences Based on the Non-cooperation of Producers is Not Supported by Substantial Evidence**

**a.**

**Defendant Has Applied Adverse Inferences Despite A Clearly Good Faith Effort on The Part of Plaintiff**

Plaintiffs argue that Commerce improperly applied adverse inferences for their failure to obtain documentation on the coke producers' shut-downs. According to Plaintiffs, "DOC cannot take adverse inferences where it has asked for information, been told that it does not exist, and there is nothing on the record to contradict that absence of data." Plaintiff's Memo at 23. Plaintiffs maintain there was "no list of closed companies . . . at the time of questionnaire and supplemental responses." Plaintiffs' Reply Brief at 7. While they "made every effort possible to provide information to DOC," they could not "force these independent companies to cooperate with [Commerce]" as "the producers were independent and unrelated to the exporters." Id.

21

Plaintiffs further point out that during verification, Chinese government officials offered to provide Commerce with a list of companies that had shut down due to environmentally-objectionable equipment,[17] but that the latter rejected this information as "new information." Id. at 8. Plaintiffs claim Commerce improperly rejected this information because one of the purposes of verification is to "corroborate[], support[], or clarif[y] information already on the record." Id. at 9.

On this basis, Plaintiffs argue that Commerce's imposition of adverse facts available was unwarranted and that it should instead resort to non-adverse facts available for determining the normal values of Chinese producers who had informed Commerce of their shutdowns.

Defendant, in turn, argues that Commerce's decision to apply adverse facts available was supported by substantial evidence and in accordance with law. According to Defendant, Commerce needed "usage rate information from the actual PRC producers" in order to "accurately calculate normal value based upon the factors of production methdology." Defendant's Memo at 20. To achieve this objective, Commerce requested that Plaintiffs "submit a Section D questionnaire response from each of their suppliers." Id. While some of the suppliers "expressed a clear lack of interest in participating in this investigation," others had simply been shut down due to environmentally related hazards. Id. at 21.

Defendant claims that adverse inferences were warranted in the case of non-cooperating suppliers because "Commerce reasonably found that Sinochem, CITIC, and Shanxi did not act to the best of their ability in urging their suppliers to comply with Commerce's request for

---

[17] According to Plaintiffs, this list "had been compiled on March 8, 2001, only a few weeks before verification." Plaintiff's Reply Brief at 8.

information." Id. at 21.  For the other non-responsive suppliers, Defendant similarly argues that

Plaintiffs did not act to the best of their ability in submitting information that would either list or

identify the specific companies that had been shut down.  According to Defendants, Plaintiffs

were never limited to compiling a list of shut down plants, but rather could submit any

documentation that would substantiate the closures.  Consequently, Defendant argues that

Plaintiffs had no basis for claiming that a list could not be compiled within time constraints, as

any other evidence would have sufficed.  On this basis, Defendant concludes that Commerce's

determination on adverse facts available was supported by substantial evidence and in

accordance with law.

**b.**

**Plaintiffs Acted to the Best of Their Ability In Providing Commerce With Information on**

**the Non-responding Producers' Shutdowns**

In arriving at its Final Determination, Commerce is required to use facts otherwise

available if "necessary information is not available on the record," or:

> (2) an interested party or any other person -
> (A) withholds information that has been requested by [Commerce] ... under this
> subtitle,
> (B) fails to provide such information by the deadlines for submission of the
> information or in the form and manner requested, subject to subsections (c)(1) and
> (e) of section 1677m of this title,
> (C) significantly impedes a proceeding under this subtitle, or
> (D) provides such information but the information cannot be verified as provided
> in section 1677m(i) of this title . . .

19 USC § 1677e(a)(1999).

The use of facts available, however, is limited by 19 U.S.C. §1677m(d), which was "designed to prevent the unrestrained use of facts available as to a firm which makes its best effort to cooperate with [Commerce]." Borden, Inc. v. United States, 4 F. Supp. 2d 1221, 1245 (CIT 1998). Section 1677m(d) provides that:

> If [Commerce] . . . determines that a response to a request for information under this subtitle does not comply with the request, [Commerce] . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of the investigations or reviews under this title. If that person submits further information in response to such deficiency and either -
>
> (1) [Commerce] finds that such response is not satisfactory, or
> (2) such response is not submitted within the applicable time limits,
>
> then [Commerce] . . . may, subject to subsection (e) of this section, disregard all or part of the original and subsequent responses.

19 USC § 1677m(d)(1999).

> Subsection (e) of the same section further provides that:
>
> In reaching a determination . . . [Commerce] . . . shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce] . . . if -
>
> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] . . . with respect to the information, and
> (5) the information can be used without undue difficulties.

19 USC § 1677m(e) (1999).

24

19 USC § 1677m(d) requires that Commerce, prior to resorting to facts available, give a party an opportunity to remedy or explain deficiencies in its submission. Subject to the conditions in Subsection (e), the remedy or explanation provided by the party may be disregarded in favor of facts available if the information is found to be "not satisfactory" or untimely. See Borden, 4 F.Supp.2d at 1245 ("Subsection (e) may require use of the respondent's information notwithstanding that a remedy or explanation is unsatisfactory.").

If Commerce makes an additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may resort to adverse facts available under 19 USC § 1677e(b)(1999). However, a failure to respond is only a basis for facts available, as Commerce must make the additional finding that the party "failed to cooperate by not acting to the best of its ability" in order to draw adverse inferences. 19 USC § 1677e(b); see also Mannesmannrohren-Werke AG v. United States, 23 CIT 826, 77 F. Supp. 2d 1302, 1315 (1999). A party can therefore "fail to respond because it was not able to obtain the requested information, did not properly understand the question asked, or simply overlooked a particular request," without having adverse inferences drawn against it. Mannesmannrohren-Werke AG, 77 F. Supp. 2d at 1316.

Moreover, Commerce may not simply provide the conclusory statement that a party "has failed to cooperate by not acting to the best of its ability," or repeat its findings with regards to facts available, in order to draw adverse inferences against it. Mannesmannrohren-Werke AG, 77 F. Supp. 2d at 1313; see also Borden, 4 F. Supp. 2d at 1246 ("Here, the Department did not make the required additional finding that De Cecco had failed to act to the best of its ability. In essence, it simply repeated its 19 USC § 1677e(a)(2)(B) finding, using slightly different words. . .

25

") (citation omitted); <u>Ferro Union, Inc. v. United States</u>, 23 CIT 178, 44 F. Supp. 2d 1310, 1329 (CIT 1999) ("Once Commerce has determined under 19 USC § 1677e(a) that it may resort to facts available, it must make additional findings prior to applying 19 USC § 1677e(b) and drawing an adverse inference."). Commerce must "articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation." <u>Mannesmannrohren-Werke AG</u>, 77 F. Supp. 2d at 1313, 1314; <u>see</u> <u>also</u> <u>Ferro Union</u>, 44 F. Supp. 2d at 1332 ("If overall the failure to identify these companies was of no significance to the progress of the investigation, then Commerce cannot apply total adverse facts on the basis of the non-identification of these companies.").

Applying this standard here, the Court finds that Plaintiffs acted to the best of their ability in providing Commerce with information on the non-responding producers' shutdowns. During the investigation, Plaintiffs submitted notices from the Qingxu County government and from the Shanxi Province demonstrating that the local governments had ordered the shutdown of factories not in compliance with the environmental emission standards.[18] Plaintiffs also notified Commerce that they were unable and could not force the producers to provide information substantiating their shutdowns because the producers were unrelated and independent entities.

Although Plaintiffs never submitted evidence specifically identifying the producers that were forced to shut down, they did submit information clearly demonstrating that massive shutdowns had been ordered by the PRC government. These producers were completely

---

[18] <u>See</u> "Notice of the People's Government of Qing-Xu County Regarding June 5 shut-Down Action to the enterprise and Equipment which are Unable to Finish Harness Task within the Limited Time;" Prop. Doc. No. 55; "Notice About the Close Down of the Enterprise which do not Finish the Regulation within the Time Limitation," Prop. Doc. No. 56.

independent from Plaintiffs and neither Defendant nor Defendant-Intervenors point to evidence in the record that would demonstrate that Plaintiffs actually were in a position to obtain such evidence. As Plaintiffs correctly state, "[t]here . . . is no factual challenge to the record evidence that the producers were independent and unrelated to the exporters and that the exporters in any way could force these independent companies to cooperate with DOC." Plaintiff's Reply Brief at 7.

While Commerce does state in the Final Determination that "there is no evidence on the record to determine whether the specific suppliers at issue were among those shut down by the government," Commerce fails to articulate any reason as to why it concluded Plaintiffs have failed to act to the best of their ability. Decision Memorandum at Comment 9. In other words, Commerce did not explain the basis for its conclusion that Plaintiffs' best abilities included obtaining the necessary information from the producers. To conclude that Plaintiffs somehow could have obtained this information amounts to pure speculation. As Commerce provides no reasoning, this court finds Commerce's decision to apply adverse inferences against Plaintiffs unsupported by the evidence.

In regard to Plaintiff's list submission, Commerce determined it constituted "new information" which was untimely submitted. Untimeliness alone, however, will not necessarily bar the admission of new information during verification. Commerce has often accepted new information when "(1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record." See Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams From Luxembourg, 67

27

Fed. Reg. 35488, at Comment 1 (May 20, 2002); Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany, 67 Fed. Reg. 35497, at Comment 5 (May 20, 2002); Notice of Final Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products From India, 66 Fed. Reg. 50406, at Comment 4 (Oct. 3, 2001). In fact, Commerce specifically told one of the respondents in the case that new information corroborating, supporting or clarifying the record would be accepted during verification. The list offered by Plaintiffs would fulfill that precise purpose for statements on the record regarding plant shutdowns.[19]  Consequently, this court finds Commerce's decision to reject Plaintiffs' list submission unsupported by the evidence.

Accordingly, a remand is necessary so that Commerce may include Plaintiffs' list submission in the record and use non-adverse facts available for determining the normal values of non-responding producers.

---

[19] In any case the Court questions whether, based on the record here, Commerce could conclude the information was new, as opposed to factual verification of information already submitted, that is, that the plants had been shut down.

**4.**

**The Department's Refusal to Use Surrogate Values From Related Coal Mines is**

**Unsupported by the Evidence**

**a.**

**Defendant-Intervenors and Plaintiffs Dispute Commerce's Use of Surrogate Values from**

**Unrelated Companies**

Plaintiffs argue that Commerce improperly failed to include values from related coal mines in its surrogate value calculations. According to Plaintiffs, Commerce's determination not to include these values because "[n]one of the mines are members of any of the respondents' group," is unsupported by the evidence. Plaintiffs' Memo at 25. They argue that since the companies are related, their coal is self-produced and their costs should be calculated based on their actual inputs. To support this contention, Plaintiffs cite to 19 U.S.C. §1677(33)(E)(1999) which provides that an affiliated party includes "any person directly or indirectly owning, controlling or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization." As "DOC verified the related nature of the sampled coal mine and found that the producer owned [10] percent of the shares of the mine," Plaintiffs maintain that Commerce should have used actual inputs rather than surrogate values from a comparable market economy. Plaintiffs' Memo at 25.

On this basis, Plaintiffs conclude that a remand is necessary so that Commerce may use the factors of production information from related coal mines rather than surrogate values from unrelated companies.

Defendant-Intervenors, in turn, argue that Commerce's use of the same methodology to determine the surrogate value for coal inputs purchased from both related and unrelated coal mines is supported by substantial evidence. They argue that, "[i]n determining the normal value of subject merchandise in a nonmarket economy, the Department uses factors of production which are based on the best available information regarding the values of those factors in a market economy surrogate country." Defendant-Intervenors' Brief at 20; 19 U.S.C. §1677b(c)(1). According to Defendant-Intervenors, "the valuation of factors in a surrogate country should not be based upon circumstances peculiar to the state-controlled economy." Defendant-Intervenors' Brief at 20.

In addressing Plaintiffs' arguments, Defendant-Intervenors argue that Plaintiffs failed to "provide a sufficient factual basis to support valuing the coal input any differently from the coal purchased from unaffiliated mines." Id. at 21. Defendant-Intervenors maintain that a 10 percent ownership interest or family interest in the coal mines is not sufficient to demonstrate that the coal is self-produced. Id. In addition, Defendant-Intervenors claim that Plaintiffs have also "failed to provide any legal support in their brief providing a basis for having the Department calculate separately the actual inputs for the production of coal from the related coal mines in a nonmarket economy." Id. Accordingly, they maintain that there is no Department practice, nor any statutory authority, supporting Plaintiffs' contentions. Id. at 21-23. On this basis, Defendant-Intervenors conclude that the court "should affirm the Department's use of Indian Import Statistics for the surrogate value for coal used in producing the subject merchandise." Id. at 23.

Defendant candidly states that, upon review of the record, Commerce can no longer

30

support its finding and consequently, "a remand is appropriate to allow Commerce to fully consider the issue of whether applying a factors of production methodology to the coal produced by the purportedly related coal mines is appropriate." Defendant's Memo at 17-18.

**b.**

**Commerce Failed to Provide an Adequate Explanation for its Decision to Use Surrogate Values from Unrelated Companies**

As previously discussed, section 773(c)(1) of the Tariff Act of 1930 directs Commerce to base normal value on the non-market economy producer's factors of production. 19 U.S.C. §1677b(c)(4). Commerce must base these surrogate values on the best available information and they must reflect the cost of producing goods "in one or more market economy countries that are: (A) at a level of development comparable to that of the nonmarket economy country, and (B) significant producers of the comparable merchandise." 19 U.S.C. §1677b(c)(4).

While the statute specifically provides for factors of production, Commerce is not restricted to the exclusive use of surrogate values in comparable market economies. As this court previously noted, "nothing in the [statute] or its legislative history mandates that Commerce must derive foreign market values exclusively from either actual prices paid by the nonmarket economy, or from surrogate-based values." Lasko Metal Products, Inc. v. United States, 16 CIT 1079, 1082 (1992) (quoting Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 940 (1992)). Accordingly, "Commerce may use evidence of prices paid by the nonmarket economy country to market-economy suppliers in combination with surrogate country

31

information when valuing factors of production." Id. at 1081 (quoting Tianjin Mach. Import &

Export Corp., 16 CIT at 941). The agency has often resorted to this mix and match methodology

in order to achieve greater accuracy in the calculation of dumping margins.[20]  In addition,

Commerce has similarly relied on self-produced inputs rather than surrogate values where it

could value the materials, energy, and labor employed to manufacture the input.  See

Silicomanganese From the People's Republic of China, 65 Fed. Reg. 31514 (May 18, 2000);

Certain Cut to Length Carbon Steel Plates from PRC, 62 Fed. Reg. 61964 (Nov. 20, 1997).

These methodologies are all reflective of the statute's overriding requirement for accuracy.

In reaching its Final Determination on the issue of related coal mines, Commerce

provided the following reasoning:

> Based on the record facts, we do not consider that coal is a self-produced input for any of the respondents, Shanxi Dajin International (Group) Company, Minmetals Townlord Technology Co., Ltd,, and Sinochem International Company, Ltd..  None of the mines are members of any of the respondents' group.  Therefore, we did not value coal using the factors of production for coal from the coal mines.

Decision Memorandum at Comment 3.

Commerce provides no explanation of what constitutes "respondents' group," nor does it

explain why membership in such a group signifies that Plaintiffs' merchandise is self-produced.[21]

---

[20] See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the Republic of Hungary, 56 Fed. Reg. 41,819, 41,820 (Dep't Comm. 1991) (stating that "[i]t is the Department's practice to value factor-of-production inputs at actual acquisition prices if it can be established that those inputs are purchased from a market economy country in freely convertible currency"); see also Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,588 (May 6, 1991).

[21] While Plaintiffs argue that pursuant to 19 U.S.C. §1677(33)(E) the producers and the coal mines are related, Plaintiffs fail to provide any explanation as to why close affiliation is

Accordingly, a remand is necessary so that Commerce may properly determine whether applying a factors of production methodology to the coal produced by the related coal mines is appropriate.

**5.**

**The Department's Use of Adverse Inferences Against Sinochem is Unsupported by Substantial Evidence and Not in Accordance With Law**

**a.**

**The Parties are in Dispute as to the Correct Interpretation of the Scope Language**

Plaintiffs argue that Commerce incorrectly interpreted the scope of the investigation, and accordingly that the agency's resort to adverse facts available is unsupported by the evidence and contrary to law. The petition limits the scope of the investigation to "coke larger than 100 mm (4 inches) in maximum diameter and at least 50 percent of which is retained on a 100 mm (4-inch) sieve, of a kind used in foundries."[22] Plaintiffs' Memo at 11. Plaintiffs maintain that the correct interpretation is that a shipment is subject to the order only if 50% or more of the sale contains coke that is larger than 100 mm in diameter. As the Sinochem shipment under review had only 11.50 percent of coke over 100mm, Plaintiffs argue that it was not subject to the order.

proof that the merchandise is self-produced. Similarly, while Commerce relies on membership to a "group" as the basis for its decision, it fails to explain whether this membership is equivalent to an affiliation, and whether it would signify that the merchandise is self-produced.

[22] This language is consistently used throughout the administrative proceedings. See, e.g., Petition, ITC Preliminary Determination, ITC Final Determination, Preliminary Determination, Final Determination, Decision Memorandum.

33

Plaintiffs further claim that "adverse inferences against Sinochem [are] unjustified because the product that Sinochem did not report was not subject merchandise." Id. at 29. Plaintiffs point out that in its Preliminary Determination, the ITC determined that industrial coke fell outside of the scope of this case due to its smaller size. Accordingly, Plaintiffs conclude that Sinochem's undersized coke is not within the order since it properly constitutes industrial coke rather than foundry coke.[23] On this basis, Plaintiffs argue that this court should remand the Final Determination so that Commerce may recalculate the dumping margins of Sinochem after removing adverse inferences that were drawn against that company.

Defendant, in turn, argues that the correct interpretation of the scope of the investigation is whether 50% or more of the portion of the shipment sold as being over 100mm is retained on a 100 mm sieve. According to Defendants, "the Harmonized Tariff Schedule of the United States ("HTSUS") lends guidance" in interpreting the language of this investigation. Defendant's Memo at 25. Under the 2000 version of the HTSUS subheading 2704.00.00.10, foundry coke is defined as "larger than 100 mm (4 inches) in maximum diameter and at least 50 percent of which is retained on a 100 mm (4-inch) sieve after drop shatter testing pursuant to ASTM D 3038." Id. at 25. Defendants argue that "so long as fifty percent of the coke, sold over 100 mm, passes the drop shatter testing (i.e. is retained on a 100mm sieve), it is within the scope of the order." Id. at 25-26. Accordingly, they conclude Commerce "properly determined that the portion of

---

[23]Plaintiffs similarly argue that the scope of the investigation only includes shipments where the majority of the merchandise includes coke over 100mm in size, i.e. foundry coke. Although counsel for Plaintiffs conceded at oral argument that Sinochem's 75-125 mm shipment was labeled as "foundry coke", counsel argued that Plaintiffs were relying on the ITC's initial definition of industrial coke, i.e. coke under 100mm in size, for excluding the shipment from the scope of the investigation.

[Sinochem's] sale that was made up of coke over 100 mm was within the scope of the antidumping investigation." Id. at 26.

Defendant points out that "[a]lthough Commerce did apply adverse facts available to this sale in the Preliminary Determination, . . . for the Final Determination, Commerce collected information on this sale at verification, and actually performed a 'margin analysis' on the portion of the sale that was sold as being over 100mm." Id. at 24; Decision Memorandum at Comment 12. Consequently, Defendant argues that the issue is not whether Commerce properly resorted to adverse facts available but whether Commerce correctly interpreted the scope of the investigation and order. On this basis, they conclude that Commerce's determination that the portion of Sinochem's sale over 100 mm was within the scope of the investigation is supported by substantial evidence and in accordance with law.

Finally, in addressing Plaintiffs' argument that Sinochem's merchandise is industrial coke rather than foundry coke, Defendant-Intervenors add that "there is no basis for Sinochem to assume that its labeling of subject merchandise as 'industrial coke' necessarily avoids application of the order: the ITC determination excluded 'industrial coke' from its like product finding because it defined 'industrial coke' as coke less than 100 mm in maximum diameter." Defendant-Intervenors' Brief at 28. Defendant-Intervenors therefore conclude that "[t]he ITC's like product determination did not in any way limit the applicability of the order to merchandise within the scope, i.e., coke of 100 mm or greater in maximum outside diameter and fifty percent of which is retained on a 100-mm sieve." Id. at 28.

35

**b.**

**Commerce's Interpretation of the Scope Language Conflicts With its Application**

The petition filed by the domestic industry limits the scope of the investigation to "coke larger than 100 mm (4 inches) in maximum diameter and at least 50 percent of which is retained on a 100-mm (4-inch) sieve, of a kind used in foundries." A.R. (Public) Doc. No. 1, Petition at 3. This language is consistently used throughout the proceedings and forms the basis for Commerce's Final Determination. See Final Determination, 66 Fed. Reg. at 39489. It is also further defined by reference to several headings within the HTSUS, namely subheading 2704.00.00.10 (as of Jan. 1, 2000) and subheading 2704.00.00.11 (as of July 1, 2001). Id. While these subheadings are cited as a reference, the Final Determination specifically provides that "[a]lthough the HTSUS subheadings are provided for convenience and Customs purposes, our written description of the scope of this investigation is dispositive."[24] Id.

In its Decision Memorandum, Commerce determined that Sinochem had misread the scope language and that its shipment of foundry coke straddling the scope size definition included merchandise that fell squarely within the proceedings. Commerce also provided an interpretation of the scope language:

---

[24] Defendant argues that the language of HTSUS 2704.00.00.10 supports its interpretation of the scope language. While the scope language is followed by a reference to several HTSUS headings, this reference does not indicate an intent to define the scope of covered merchandise solely based on the language of HTSUS 2704.00.00.10. See Wirth Limited v. United States, 22 CIT 285, 294 (1998). Petitioners were required by regulation to include these headings. See 19 C.F.R. § 353.12(b)(4)(1996).

> [T]he first condition of the scope is that the scope applies to coke "larger than 100mm," the second being "and at least fifty percent of which is retained on a 100-mm sieve." By including the modifier "of which" immediately after the fifty percent threshold, and with both statements following the initial condition of 100mm, the most reasonable understanding is that the test is to determine whether fifty percent or more of the coke sold as being larger than 100mm is retained on the 100mm sieve. The result of this conclusion is that the respondents' application of the fifty percent threshold to the entire volume of the portion of the sale straddling the scope is inapposite; the test should only be applied to coke above 100mm.

Decision Memorandum at Comment 12. Based on this analysis, Commerce concluded that each sale "is best conceived as being in effect two sales, one for merchandise within the scope and one outside." Id. Accordingly, Commerce performed a "margin analysis" on the portion of Sinochem's straddling shipment that exceeded the 100mm scope limit. Id.

This result, however, is wholly inconsistent with Commerce's treatment of Sinochem's other shipments, as well as the shipments of other respondents involved in the proceedings. Commerce's articulation of the scope language in the Final Determination essentially leads to the conclusion that where a shipment contains a percentage of merchandise below 100mm, the shipment in its entirety could never be considered as falling within the scope. Similarly, where a shipment is labeled as containing only merchandise over 100mm, but testing reveals that less than 100% of the merchandise is over 100mm, Commerce would also be unable to include the entire shipment as within scope. As plaintiff correctly argues, however, Commerce repeatedly resorted to a "bright line test" whereby an entire shipment is considered within scope if more than 50% of the sale is above 100mm, and outside of scope if less than 50% is below 100mm.

37

Plaintiff's Reply Brief at 10. For instance, Commerce included as within scope one hundred percent of Sinochem's 100-300 mm shipment containing 88.13 percent of merchandise over 100 mm.[25] Under the standards articulated in the Decision Memorandum, Commerce could only include up to 88.13 percent of that shipment as within scope since the test would allegedly only be applicable to merchandise over 100 mm. Under a "bright line" interpretation, however, Commerce could properly include one hundred percent of the merchandise because over fifty percent of it was over 100mm. Its decision to perform a "margin analysis" on the portion of Sinochem's straddling shipment containing 11.50 percent of coke over 100mm is consequently in direct contradiction with its prior application of the scope of the investigation, i.e. the "bright line test."[26]

Commerce provides no reasoning for its contradictory interpretation of the scope language, so a remand is necessary for it to either provide such a reasoning or resort to its previous interpretation of the language consistent with its prior practice.

_____

[25] Commerce similarly included the entire shipment of Shanxi Grand Coalchem, another respondent, as within scope where 9.90 percent of that sale was below 100mm. Plaintiff's Reply Brief at 11. With CITIC, Commerce also included one hundred percent of the merchandise where only 90.04 percent of the merchandise was above 100mm. Id.

[26] Commerce's interpretation of the scope language also presents a tautology. According to Commerce, only merchandise over 100mm should be subjected to the 100mm sieve. By definition, however, merchandise over 100mm will always be retained on a 100mm sieve. The sieve test is therefore meaningless unless the sieve can fulfill its primary purpose, i.e. to sift.

# V.

## Conclusion

For the foregoing reasons, the Court remands this case to Commerce for consideration of the issues discussed herein.

                                            _____

                                            Evan J. Wallach, Judge

Dated:        March 4, 2003
                New York, New York